Oberndorfer vs. Pabst.

---

---

OBERNDORFER, Administrator, Respondent, vs. PABST, Appel-
lant.

*September 5 — September 20, 1898.*

*Negligence causing death: Operation of passenger elevator: Evidence.*

1. It is the duty of the proprietor of an office building to see that the
   passenger elevators operated by him therein are properly and safely
   constructed, and that they are operated with the highest degree
   of skill commensurate with or proportionate to the possibility of
   injury to passengers using them.
2. In an action to recover for the death of a person who fell into the
   shaft while attempting to enter a passenger elevator in defendant's
   office building, the evidence — showing, among other things, that
   the man in charge, after stopping the car and opening the door,
   started to close the door again and to raise the car so that its floor
   would be level with that of the building, telling the deceased, who
   was attempting to enter the car, to "wait a minute;" and that de-

ceased stumbled and fell against him, causing him to throw the lever wide open, so that the car shot upward, while deceased fell into the shaft,— is *held* sufficient to warrant the submission of the case to the jury on the question of negligence.

3. The question in such case being whether or not the elevator was negligently operated at the time of the accident, evidence to show that the operator was inexperienced and incompetent tended to raise a collateral and immaterial issue, and its admission was error prejudicial to defendant.

APPEAL from a judgment of the superior court of Milwaukee county: GEO. E. SUTHERLAND, Judge. *Reversed.*

This was an action brought by the plaintiff, as administrator of the deceased, Birnbaum, to recover damages for personal injury resulting in his almost immediate death, in consequence, as it is charged, of the negligence and careless management of an elevator in defendant's office building, known as the "Pabst Building" in Milwaukee. There were three elevators running in a shaft 175 feet in height, carrying passengers to and from fourteen different floors. The complaint charged that the death of Birnbaum was caused by the carelessness and negligence of the defendant and his servant and employee, in allowing the car or cage to start and fly swiftly upward at the instant Birnbaum attempted to step into it, by reason whereof he fell into the opening caused thereby, and down the shaft of the elevator; and charged negligence and unskilfulness in the management of the elevator by the operator, and that he was unfit, unsafe, and incompetent to run and operate the elevator. The door of the car or cage was locked and unlocked from the inside, and could not be unlocked from the outside.

The answer admitted the ownership, character, use, and occupancy of the building, and that it was opened at the times mentioned for the entrance and exit of persons occupying the same or having business therein; that it was furnished or provided with elevators as stated, operated by persons employed by the defendant; and alleged that Birn-

baum, being on the eleventh floor of the building, in attempting to enter one of said elevators, fell therefrom to the ground floor or basement of said building, and was thereby killed, and that, at the time when deceased so fell, the said elevator was being run or operated by one A. H. Millar, a servant and employee of the defendant, and that the elevator was then in the act of descending from the floors above said eleventh floor of said building to the lower floors thereof; and, except as admitted, the defendant denied the allegations of the complaint.

At the trial, the said operator, Millar, testified that he was a contractor, thirty-one years of age, and had been a carpenter for about fifteen years; that, at the time in question, he was working at the Pabst Building. Plaintiff's counsel asked how long he had been working in the Pabst Building before the day in question. This was objected to as incompetent, irrelevant, and immaterial. The objection was overruled, and witness was allowed to answer that he had been working about six weeks, by the month. The defendant's counsel then stated: " I understand that evidence to have been offered for the purpose of showing the inexperience of Millar; and, if that is the fact, I would like to have it appear on the record, if the court thinks it proper to have it so appear. I cannot conceive of any other ground on which it could be received, excepting as tending to show the inexperience of Millar. In our judgment, it is entirely immaterial whether the operator of that elevator was or was not an experienced man in the operation of the elevator. The only question to be determined in this case is whether or not, at the time the accident occurred, he was or was not guilty of negligence. If he were guilty of negligence, the fact that he had been the operator of that elevator for years would not excuse him nor his employer in this case. All this evidence offered to show the inexperience of the operator, Millar, is irrelevant and immaterial, and simply tends

to raise a collateral issue, which ought not to be in the case."
Plaintiff's counsel stated that his purpose was, of course, to
show that Mr. Millar was inexperienced and notified the
superintendent of that fact when he was employed. The
objection was overruled, and the testimony admitted; and,
against the defendant's objection, the witness was allowed
to testify that he was engaged there as carpenter and for
general repair work, and he was told that he might have to
run an elevator at intervals, relieving men when they were
away; that he looked after the steam heat, and ran an ele-
vator at intervals when he had nothing else to do, and,
against the defendant's objection, that he had had no ex-
perience in running a passenger elevator; that he had been
working in the building about four weeks before he was put
on an elevator to run it, and, against like objection of the
defendant, that he had been running an elevator in that
building between two and three weeks, at certain intervals
during the day, before Birnbaum was killed; that Mr. Ellis,
the superintendent, showed him how to operate the ele-
vators, and told him that the floor of the elevator had to be
brought to a level with the floor of the building or there-
abouts, and not to open the door before the elevator was at
a dead stop.

He testified that, at the time the accident occurred, he was
operating the east elevator; Mr. Foley was its regular oper-
ator; that he saw a man standing on the eleventh floor when
he went up, but did not know whether it was Birnbaum or
who it was; that he was on the eleventh floor, coming to-
wards the elevator shaft, when he went up; that he went
to the thirteenth floor, then came back to the eleventh floor,
and stopped when a man said "Down;" that he opened the
door partially; did not known exactly how near the door of
the elevator the man was standing when he came down;
he was standing pretty close to the grating; the man said
"Down," and he opened the door, found that his elevator

Oberndorfer vs. Pabst.

was below the floor; that he told the man to "wait a moment," and started to close the door and threw the lever of the elevator on the *up*, to fetch it back in place; at the same time, the man started to step in; that he thought he must have tripped or something, fell against him, causing him to throw the lever wide open, shooting the elevator up; that he did not know exactly how far the elevator shot up; he thought, when he got it under control, that the floor of the elevator was about two feet below the top of the elevator door between the eleventh and twelfth floors; the floor of the car was about six or eight inches below the floor of the building on which Birnbaum stood when he attempted to enter the car, but did not know how far the car was below the level of the floor upon which Birnbaum stood when he opened the door; the car started to settle away a little bit, and he told the gentleman to "wait a minute;" that, when he started to fetch it back, it was between six and eight inches below the floor; when Birnbaum attempted to enter, witness attempted to shut the door, and threw the lever on the *up*, to fetch the car up in attempting to get it on a level with the floor; moved the lever; that he operated the lever with his right hand, stood very close to the door, perhaps fourteen or eighteen inches, in front; he could not tell what became of Birnbaum when the car stopped, he was nowhere in his sight, must have fallen down the shaft; that when he said, "Stop a minute," Birnbaum was about to step into the elevator.

The testimony was that the deceased, at the time of his death, was strong and healthy; habits good; that he supported his wife and family up to the time of his death, and that they had three children, whose ages were as stated; and that he was in the real-estate business, steamship and insurance agent.

The defendant, at the close of the plaintiff's testimony, moved for a nonsuit, which was denied.

George Foley, on behalf of the defendant, testified that, at the time the accident occurred, he was on the twelfth floor, just above the floor where Birnbaum fell down the shaft, and heard Millar say, "Just wait a minute;" that, if a man is any good at all, he ought to learn to operate one of these elevators in four or five days; that Millar was pretty good at it; that witness had been in the building, running the elevator, over five years.

The court charged the jury, among other things, that the proprietor of such a building as the Pabst Building had been shown to be, who occupies and uses it, is bound to see that the elevators therein are operated with the highest degree of care and skill commensurate with or proportionate to the possibility of injury to passengers in the use of the elevators, and is bound to employ men to operate the elevators who will do all that human vigilance and foresight can do under the circumstances to protect and care for the safety of the passengers, and, in view of the character of the mode of conveyance adopted, reasonably to guard passengers who have entered or are about to enter the car against accident and consequent injury; that the failure of the operator of the elevator to use such care and skill is the failure of the owner of the building, and constitutes negligence, for the results of which the owner of the building is responsible; that the first question for the jury to determine was whether the elevator man, Millar, at the time of the accident, was operating the car with the degree of care and skill so required while operating the elevator. The trial judge explained that, by operating the elevator, he meant all that the elevator man, Millar, did in moving the elevator lever, and in stopping the car going down and up again, and in moving the car up and down, and in opening the door as an invitation to enter, or in closing it, or blocking the doorway or entrance to the elevator car from the hallway, or warning the deceased not to enter the car; that they were to take into consideration

all the testimony and all the surrounding facts and circum-
stances, as disclosed by the evidence, and should consider
the movement of the car, the efforts made by the elevator
man, Millar, to control it, *the promptness with which he was
required to act, the length of time he had been operating ele-
vators, the difficulty or ease with which skill in operating ele-
vators can be acquired,* the instructions he had received as to
operating elevators, and this elevator in particular, and all
the other facts and circumstances disclosed by the evidence
bearing upon this question,— and say whether there was or
was not any failure on his part to use the degree of care and
skill stated in operating the elevator at the time in question;
that, before plaintiff could claim a verdict, he must satisfy
the jury, by a clear preponderance of the testimony, that the
elevator man, Millar, did not operate the car in question at
the time with the degree of care and skill stated. The de-
fendant excepted to the portions of the charge as to the
length of time Millar had been operating the elevators, and
the difficulty or ease with which skill in operating the ele-
vators can be acquired, and relating to his competency or
qualifications to properly manage or operate this elevator in
particular.

The court charged the jury that if the door of the elevator
was thrown open by Millar, and the deceased understood
such opening of the door to be an invitation and signal to
enter the car, he was not bound to stop and look and listen
or to make any special examination; that an elevator for
the carriage of persons is not like a railroad crossing, and
supposed to be a place of danger, to be approached with
caution, but, on the contrary, it might be assumed that,
when the door was thrown open by an attendant, the car
might be safely entered. These portions of the charge were
excepted to.

The question whether Birnbaum was guilty of contribu-
tory negligence on his part, which proximately caused his

death or contributed to it, was submitted to the jury. They returned a verdict for the plaintiff for $5,000, upon which the plaintiff had judgment, from which the defendant appealed.

For the appellant there were briefs by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *J. G. Flanders.* They argued, among other things, that the admission of evidence as to the character of the man for competency and efficiency raised a collateral issue in the case tending to divert the minds of the jury from the real issue and to prejudice them against the defendant. *Tenney v. Tuttle,* 1 Allen, 185; *Wooster v. B. & S. A. R. Co.* 72 Hun, 197; *Peoria & P. U. R. Co. v. Clayburg,* 107 Ill. 644; *Hays v. Miller,* 77 Pa. St. 238, 240, 241; *Maguire v. Middlesex R. Co.* 115 Mass. 240, and cases cited; *Gahagan v. B. & L. R. Co.* 1 Allen, 187; *Tuttle v. Fitchburg R. Co.* 152 Mass. 42.

For the respondent there was a brief by *Felker, Doe & Felker*, and oral argument by *J. B. Doe.* They contended, *inter alia,* that, it being admitted that the deceased was killed in attempting to enter the elevator, it was incumbent on the defendant to prove that the person operating the elevator was a person of competent skill and in every respect qualified for the business in which he was engaged, and that he acted on that occasion with reasonable skill and with the utmost prudence and caution; and if the disaster in question was occasioned by the least negligence or want of skill or prudence on his part, then the defendant is liable. *Stokes v. Saltonstall,* 13 Pet. 181, 191; *Treadwell v. Whittier,* 80 Cal. 576; *Goodsell v. Taylor,* 41 Minn. 207; *Cummings v. Nat. F. Co.* 60 Wis. 603; *Kirst v. M., L. S. & W. R. Co.* 46 id. 489. In connection with the facts tending to show the negligence that caused the injury, the plaintiff had a right to show, as a part of the surrounding circumstances, the unskilfulness, incompetence, or want of experience of the servant. *Gilman v. Eastern R. Co.* 13 Allen, 433; Hutchinson, Carriers, §§ 535,

536; *Vicksburg & J. R. Co. v. Patton*, 31 Miss. 156, 194; Wharton, Neg. § 170; Wharton, Ev. § 48 *et seq.;* Abbott, Trial Ev. 585; *Bigley v. Williams*, 80 Pa. St. 107, 114, 115; *McKinney v. Neil*, 1 McLean, 540. If, by direct evidence, it appears that the operator was unskilful or of bad habits, it casts upon the defendant the burden of proving that he used proper care at the time in question. *Penn. R. Co. v. Books*, 57 Pa. St. 339, 343.

PINNEY, J.   It appears that the Pabst Building was thirteen stories in height, and each story at the time of the accident contained a large number of rooms, which were mainly used and occupied for offices by lawyers, insurance agents, and other business men, and were open during the daytime, as well as during a portion of the nighttime, for the entrance and exit of all persons occupying the same, as well as all other persons having business therein or occasion to enter the same.   It was the duty of the defendant, as its proprietor, and so occupying and using the building, to see that the steam elevators therein provided for access to and exit from its several floors or rooms were properly and safely constructed and operated with the highest degree of skill and care commensurate with or proportionate to the possibility of injury to passengers in the use of such elevators. He was bound to employ men to operate them who would do all that human foresight and vigilance could do under the circumstances to protect and care for the safety of passengers, and, in view of the character and mode of conveyance adopted, reasonably to guard passengers who had entered or were about to enter the car from or against accident and consequent injury.   This is a duty of which he could not discharge himself by delegating or turning it over to employees or operatives, however experienced or skilful. His liability was continuous until his duty was performed, and the failure of the operator to use such care and skill

would be the failure of the proprietor himself, and would constitute negligence, for which the latter would be responsible. It is not deemed necessary to set out more fully the evidence. Suffice it to say that we consider it sufficient to warrant the submission of the case to the jury upon the question of negligence, and that there was no error in denying the defendant's motion for a nonsuit, or in refusing to direct a verdict in his favor.

The court allowed evidence to be given to the jury, against the defendant's objection, showing and tending to show that Millar, the defendant's employee, who operated the elevator at the time of the accident in question, was inexperienced and incompetent. The purpose for which the evidence referred to was offered and received was conceded, and the plaintiff was allowed, against defendant's objection, to show that Millar was engaged there *as a carpenter*, though he was told when he was engaged that he might have to run an elevator at intervals, relieving men when they went away; that in the course of his service he did general repair work around there, repair of the building in several places, and looked after the steam heat; that he ran an elevator the latter part of the time when he was there when he had nothing else to do; that when he was employed to work in the building by the month he had had no experience in running a passenger elevator; that he had been working in the building about four weeks or a month before he was put on an elevator to run it, and had been running one two or three weeks before Birnbaum was killed; that in the morning, between 9 and 10 o'clock, he had to relieve all three men on the elevator, fifteen minutes for each man, and from a quarter past 11 till 12 o'clock he relieved one man for dinner, and from 1 to 2 he had to relieve the east-car man for dinner, and between 3 and 4 o'clock, or half past 3 to 4, he had to relieve the men again for fifteen minutes each. He testified that Ellis, the superintendent, showed him how

to operate the elevator in the Pabst Building; that at the time of the accident he was operating the east elevator, of which Foley was the regular operator.

The evidence thus given tended to raise a collateral and immaterial issue prejudicial to the defendant, and the jury may well have understood that these collateral and immaterial matters had a vital and important bearing upon the merits of the case. It certainly was not material to the question of whether Millar was negligent at the time of the accident that he had run elevators previously, or how long, or had been hired for that purpose, or whether or not he was or had been a carpenter, or worked at repairs in or about the building. This evidence had no tendency to show whether or not the elevator was negligently or improperly operated. If on that occasion Millar discharged his duty properly, and did all that a competent and faithful operator ought to have done, the allegation of his negligence certainly fails. The evidence thus received raised collateral questions tending to divert the minds of the jury from the real and legitimate issue, namely, that of the negligence of the defendant or his servant in operating the elevator. The jury were not instructed to disregard the evidence thus improperly elicited, but, on the contrary, might fairly infer from these rulings and the charge of the court the materiality of all these questions to the merits of the cause, independent of the vital one of negligence of the defendant or his servant. These rulings apparently left the case open to discussion before the jury on points wholly irrelevant, and yet of a character liable to be extremely prejudicial to the rights and interests of the defendant.

For these reasons, the superior court erred in the rulings above set forth, and its judgment must be reversed, and the cause remanded for a new trial.

*By the Court.*— The judgment of the superior court is reversed, and the cause remanded for a new trial.