## SOLDANO v. NEW YORK LIFE INS. CO. et al.

### No. 17417.

Court of Appeal of Louisiana. Orleans.

June 4, 1940.

Spearing, McClendon & McCabe, of New Orleans, for appellants.

W. A. Gillaspie, Jr., of New Orleans, for appellee.

JANVIER, Judge.

New York Life Insurance Company is the owner of a large office building in the City of New Orleans known as the Maritime Building and located on the up-town lake corner of Carondelet and Common Streets.

Macio Jones is a porter in the employ of the said life insurance company, his duties including the cleaning and caretaking of the floor of an arcade on the ground floor of this building.

Anthony Soldano, who had entered the building as a customer of a watchmaker, whose place of business was located in the arcade, sustained severe injuries at about 3:35 o'clock on the afternoon of June 22, 1939, when he fell to the floor of the basement through a trapdoor in the floor of the arcade, which door had been left open by the porter, Jones.

Soldano alleges that his injuries resulted from negligence on the part of Jones in leaving the trapdoor open and in not placing in front of it a barrier which would have prevented anyone from falling into it, and he also charges that there was negligence in the New York Life Insurance Company in letting to the watchmaker space so close to the trapdoor, in not providing a proper barrier to guard the said trapdoor, in not providing proper lights in the basement, and in not stationing a guard at the said trapdoor to warn anyone against the danger of approaching too close to it. It is also alleged that the negligent acts of Jones—already referred to—were committed by him in connection with his duties as an employee of the defendant life insurance company and that, therefore, the said company, as well as he, is liable for the results of those negligent acts.

Both defendants deny all the charges of negligence and they particularly assert that, on the floor of the arcade and in front of the trapdoor, there was "a heavy wooden balustrade three feet high, which rests on a broad base and which is not easily moved", and they further aver that the cause of Soldano's fall was his own negligence in not looking where he was walking and in pushing aside the barrier which was located in front of the trapdoor, and, in the alternative, they maintain that, if there was any negligence with which they are chargeable, that negligence was not the proximate cause of plaintiff's fall, which said proximate cause was his own contributory negligence already referred to.

There was a trial by jury, which rendered a unanimous verdict for $3,000 in favor of plaintiff and against both defendants solidarily. From the judgment based on this verdict, Jones has appealed devolutively and the New York Life Insurance Company suspensively, and Soldano has answered the appeals praying that the award be increased to $14,646, as originally prayed for.

Defendants contend, first, that Soldano pushed aside the barrier which had been provided and which Jones had placed in position in front of the trap door and that, therefore, regardless of whether it was negligence to maintain the said opening so close to the side of the watchmaker's establishment and regardless of whether the said basement or pit was properly lighted, and regardless, also, of whether it was negligence on the part of Jones to leave the door open at all, Soldano's actions in pushing aside the barrier and in stepping into the space which was back of it—and particularly his failure, under those circumstances, to notice the open trapdoor—constituted acts of contributory negligence on his part which should be considered as having been the real and proximate cause of his fall.

At this point and in connection with the plea of contributory negligence, it might be well to call attention to a contention made by plaintiff to the effect that defendants should not be heard to urge the contributory negligence of plaintiff for the reason that in their answer they allege that, when he pushed aside the wooden barrier, he did it inadvertently. Plaintiff maintains that there can be no contributory negligence where the act, which would otherwise constitute contributory negligence, is the result of inadvertence. We may as well say here that we cannot agree with this contention. Contributory negligence often results from careless inattention and, in fact, results from such inattention more often than from deliberate acts of negligence. Gustine v. Big Chain Stores, La.App., 180 So. 852;

Glatstein v. City of Shreveport, La.App., 149 So. 158.

Defendants also declare that, even if it appears that the barrier was not placed in position, or had been so placed that, without noticing it, Soldano might have passed between its end and the wall of the watchmaker's establishment, and even, therefore, if Soldano was not warned by contact with the said barrier that it was dangerous to go into that space or alcove, still it was unnecessary for him to do so, and therefore, when he entered it, he lost his right to claim the status of an invitee and became, at best, a licensee, and that, therefore, to him defendants owed no duty except that of not wantonly inflicting injury upon him; that under these circumstances it was his duty to protect himself against any dangers which might exist in that space into which he was not invited expressly or impliedly and into which he had ventured entirely at his own risk.

Before it can be determined just what legal status was occupied by Soldano, we must first determine why he had entered the arcade in the first place, just how the alcove—containing the trapdoor—was located with reference to the balance of the arcade of the building, and just why Soldano went into that alcove. The arcade—on the ground floor of the building —is a passageway extending from Carondelet Street, on which the building fronts, to a cross-arcade in the rear of the building, which cross-arcade, now covered, is an extension of what is known as "Varieties Alley". The main arcade is about 17 feet wide and, on its uptown side, there is located a row of small establishments in what may be called booths and which are about six feet in depth, leaving, as the open portion of the arcade, a space of about 11½ feet running from Carondelet Street to the rear of the building and there connecting with the cross-arcade which forms a part of Varieties Alley. On the other side of the main arcade are doors leading to stock and cotton brokerage offices located on the main portion of the ground floor of the building. Of the establishments in the narrow booths alongside the wall of the arcade, the last towards the rear of the building is one operated by James F. Roques as a watchmaker and repairer. Though this is the last establishment towards the rear of the arcade, the space occupied by it does not extend to the rear wall of the building, there remaining, between the rear wall and the end of the said watchmaker's booth, an open space 6 feet 9 inches in width and about 6 feet in depth and which extends from the open passageway of the arcade to the side wall of the building.

In other words, as a pedestrian enters the arcade from Carondelet Street, he steps into the end of the open passageway, 11 feet wide and extending through the entire length of the building. On his left are the counters of the various booths, which, with an opening here and there, extend to a point 6 feet 9 inches from the other end of the building, and at that point the arcade widens an additional 6 feet and, with this further width, extends 6 feet 9 inches further to the rear doors of the arcade. The three doors at the rear of the arcade total 9 feet 6 inches in width and the one nearest the uptown wall of the building is 6 feet 1 inch from that wall, so that, if a person enters by that door and walks straight towards the front of the building, he will not find it necessary to pass through the little alcove to his right, in which is located the all-important trapdoor.

However, though there was no business establishment located in that alcove, immediately adjacent to it was the partition of Roques' watch shop, and above the marble base of this partition there was a transparent glass panel, which rose to a total height of about 8 or 10 feet. Soldano had left with Roques for repairs a watch, and his purpose, in entering the arcade, was to secure its return. He entered from the rear of the building, or Varieties Alley, and passed safely by the alcove to his right, and at the counter of the watch shop asked the clerk for the watch. He had not brought with him the identification claim check which had been given him and the clerk, whose name was Tybussek, had difficulty in locating and identifying the watch. On the rear wall of the shop, which was the side wall of the building, was a large board on which a hundred or more watches were hanging, and Soldano believing that on this board he could recognize his watch, attempted to point it out to Tybussek. Tybussek walked back to the board in the rear and, still finding difficulty in identifying the watch, pointed to several one at a time. Soldano shook his head negatively several times and then, with his

eyes directed through the partition at the watches on the wall, walked along the front wall and turned at the corner and walked along the side partition, at the same time pointing to the watch which he thought was his, and shaking his head negatively as Tybussek would touch each of the watches nearest to that partition. He thus stepped out of the main or general passageway of the arcade around the corner of the glass partition and entered the small alcove in which the trapdoor was located. The watch which he was endeavoring to point out was hanging near the top of the board and very near to the glass partition, so that, as Soldano focused his attention through the glass partition and on the watch, his glance was directed upwards and he did not notice the open trapdoor on the floor to his right. He fell through it to the floor of the basement and sustained serious injuries.

Assuming, for the moment, that the barrier was not in place, and therefore was not pushed aside by Soldano, and considering the contention of defendants that, even under those conditions, Soldano was a mere licensee because there was no necessity for him to go into that alcove, it is unnecessary for us to say much more than that we cannot accept this view. If there was no barrier, then there was nothing to warn Soldano that that alcove—which, as a matter of fact, was in reality a part of the main arcade—was not intended for the use of occupants of the building and for their customers. It is true that it extended out from the main passageway, but we know of no reasons for holding that persons using such arcades or passageways must walk along straight lines and may not make use of alcoves when they find it convenient to do so, unless there are obstructions indicating that such places are reserved, or unless they are located so far away from the main passageways or thoroughfares that their use by pedestrians is obviously not necessary and will amount practically to trespass.

The facts here differ greatly from those found in Vargas v. Blue Seal Bottling Works, Ltd., 12 La.App. 652, 126 So. 707, and in Foshee v. Grant, 152 La. 303, 93 So. 102, both relied upon by defendants. In the Vargas case the plaintiff had visited the office of the bottling plant of defendant on business and, while in that office, was obviously an invitee. But after his business visit had terminated, he had asked and been granted permission to remain and to watch the operation of a bottling machine not in the office, but in another part of the building. We held that he had remained at his own request and had gone into this other portion of the building, to which his business had not called him, and had thus become a mere licensee.

Likewise, in the Foshee case, the plaintiff, desiring to purchase beer at a barroom, had found it crowded, and, for his own convenience, had gone into the wareroom nearby but in which patrons were not expected to congregate. While there he had seated himself on the end of an empty barrel, on which, unfortunately, there was a small pool of dissolved concentrated lye. He was burned severely. The Supreme Court held him to be a mere licensee.

But here the plaintiff entered the lobby of the building and, in connection with the business for which he had entered, went into the alcove immediately next to the glass partition through which he was, by signs, conducting business with a tenant of the building. It may be that he could ultimately have located his watch by remaining in front of the main portion of the booth, but it seemed to him and to Tybussek, the clerk, that it was more convenient that he proceed along the side portion and attempt to point out the watch. If there was no barrier or other warning to keep him out of that part of the arcade, we see no reason to hold that, in going into it, he lost his status as invitee and became a mere licensee and, that a person entering an office building to do business with tenants occupying space therein is an invitee of the building owner, we have no doubt at all.

There is, of course, the possibility that the barrier had been placed in front of the opening and that Soldano passed between the end of the barrier and the partition of the jewelry establishment because, according to some of the witnesses, the barrier was 15 inches shorter than that space, and therefore Jones may have placed it carelessly with one end against the rear wall of the building, and thus, if it was 15 inches shorter, there would have been left at the other end an opening through which Soldano might possibly have passed without noticing the barrier at all since

No

he seems to have been very close to the partition as he walked along it looking through the glass. There is some conflict in the testimony as to whether the barrier was 15 inches too short, or only 11½ inches too short. If the latter estimate is correct, it is highly improbable that he would have passed through that opening without noticing it, or without striking against it, and, if we felt that it was only that much too short and was in place, we would hold him negligent in going behind it.

Now, assuming again for the moment that the barrier was not in place, let us consider whether Soldano can be said to have been negligent in not noticing the opening in the floor as he walked along the side of the glass partition looking through it in an effort to point out his watch.

In Ransom v. Kreeger Store, Inc., et al., La.App., 158 So. 600, is found a case the deciding factor of which, we think, was very similar to the controlling fact here. There there was a slippery and wet spot on the floor of a department store. On this plaintiff slipped and fell. While recognizing the fact that, ordinarily, persons must exercise reasonable care to see defects in, or obstructions on the floor on which they are walking, we held that it is not negligence for one who, in a store and intent upon looking at goods placed on a counter somewhat elevated above the floor, fails to notice such a spot. Of course, in order that a customer in a store be entitled to recovery—and we think a person in an office building to trade with a tenant is in the same legal category as a customer in a store—it is necessary that there be ignorance of the danger, for, obviously, it would be contributory negligence to walk into a known danger. But where, for some reasonable cause, the customer's eyes are properly directed at some other spot and where there is no reason to assume that the floor is not safe, it is not negligence for such a customer to do as plaintiff was doing in the Ransom case and to elevate the eyes above the floor to look at displayed goods.

Here, as in the Ransom case, the plaintiff's eyes were not negligently diverted from the floor. He was engaged in conducting his business and, in order to do so, it was not unreasonable for him to look through the partition to elevate his eyes to the spot at which his watch

was located, and we think that this is true even though the cover of the door which would have covered the opening was raised somewhat above the floor.

In Williams v. Liberty Stores, Inc., 148 La. 450, 87 So. 233, and also in the Ransom case, is recognized the distinction between an obstruction which is placed on the floor and extends above it and a spot or defect in the floor itself. But we think that even where the obstruction extends above the floor, it is not negligence to fail to notice it under such conditions as existed here. We see no negligence, then, in plaintiff, if we find well-founded the assumption that he did not move the barrier. However, we have no doubt at all that, if the barrier was in place and he moved it in order to enter the space which was protected by it, or, if it was only 11½ inches too short and he had to "squeeze" through, he did so at his peril and should, by its presence, have been put on notice of the danger ahead. If he was so put on notice, then to have walked into the hole would have been negligence of the grossest character.

Let us say here that the record shows that the alcove and the basement below were adequately lighted and that, had Soldano even glanced at the floor, he must have seen and recognized the danger, for the cover of the opening was practically black, whereas the surrounding floor was white marble.

Concluding, then, that the question presented is solely one of fact—that is, was the barrier in place and did Soldano move it aside himself—we now consider the question of fact.

There were only two eyewitnesses to the fall—Soldano himself and the defendant porter, Macio Jones. Soldano says positively that the rail was not in place in front of the trapdoor and he is certain that he did not push it aside when he entered the alcove. Jones, on the other hand, is equally positive that he had placed the barrier in position and that Soldano pushed it aside, and he also asserts that he noticed Soldano as he gave evidence of an intention to move the barrier and that he called to him twice, saying: "Don't go back there." And he says that, in spite of this warning, plaintiff "looked around at me and just went on back". However, after an extended cross-examination as to whether Soldano had heard

these warnings, he finally said: "I don't know."

There is partial corroboration of the statement of each of these two. Tybussek, the clerk, says that he cannot be certain that the rail was in place, but that he was so accustomed to seeing it in its proper position that he feels positive that he would have noticed its absence. He could see Soldano as he walked on the outside of the partition and as he turned from the main arcade into the alcove and he says that he "thought" that he saw Jones' lips move as he seemed to say something to Soldano, but he adds: "I couldn't hear what he said; you can't hear through those glasses." When asked whether it appeared that Soldano heard what Jones said, he answered: "Well, it didn't look like he did."

We attach significance to this for the reason that, since Jones was standing only 6 or 8 feet away from Soldano as the latter is said to have moved the barrier and as Jones claims that he warned him twice not to do so, it would seem incredible that Jones, if he did call out such extended warnings as he indicates, would not have done more when he saw that, apparently, Soldano did not hear him, or at any rate did not give evidence of intention to heed the warning. Jones knew that the opening extended almost from one end of the alcove to the other—its brink was only 13¾ inches from the partition along which Soldano was proceeding—and Jones must have appreciated the gravity of the danger. It is, then, almost unbelievable that, if he saw Soldano push aside the rail, he did no more than call out a warning.

And there is other evidence corroborative of the testimony of plaintiff that the rail was not in a position. Joseph Richidella, a newscarrier, only a few minutes before, had been standing just outside the rear door talking to a friend, Katz, and had mentioned to him that the barrier was not in position and that, therefore, the open hole constituted a grave danger. Katz corroborated this.

On the other hand, there is evidence which tends to prove that the rail was in its proper place. It is shown by Joseph Miller, the building manager who went to the scene about five minutes after the occurrence of the accident, that, when he reached the spot, the rail "had been pulled out into the passageway more", and, he added, "someone evidently to make room to get him out of the hole, had shoved the railing out where the people were; * *".

Counsel for plaintiff concedes that the rail was present in the alcove, but he argues that Jones must have left it against the wall of the building and must have forgotten to put it into its position in front of the pit. But the above quoted statement of Miller tends to show the contrary because, if the rail had been left against the wall, there would have been no reason to pull it out into the passageway to clear a space where Soldano might be laid because against the wall it would already have been entirely out of the way.

There is in the record still other evidence bearing upon the question of whether the barrier was in position, but none of it serves to convince us positively on that point, and all that we can say is that a conclusion on this controlling question of fact might be made one way as well as the other, depending on which statements are to be believed. For such a situation we find admirably suited the rule that, on a question of fact, we should not disturb the finding of a jury unless it is obviously erroneous. We cannot say that this finding here is manifestly incorrect.

Plaintiff's injuries consisted in the main of a fracture of the humerus of the right arm, the humerus being the large bone between the shoulder and the elbow. From this, according to his physician, he has sustained a functional loss of the use of his right hand amounting to about 25 per cent. He suffered contusions and bruises such as might be expected to result from such a fall. He remained confined to his bed a period of from six to eight days, and his arm was immobilized in splints for about three weeks. He was under the care of his physician until the end of September—about three and one-half months. At the time of the trial on March 12, 1940, which was nearly nine months after the accident, his doctor stated that the partial disability of his right hand amounted to about 25 per cent. and he said: "I think it has improved about as far as it will."

The bill of the doctor was $75.

Claim is made for loss of earnings, and the evidence shows that plaintiff had been employed to go to work on the day after the accident as the dealer in a gambling establishment and that his daily rate of pay would have been $7. The evidence

further shows that this particular game operated for only twenty-eight days and that, therefore, even had he been able to do the work which he had been employed to do, his employment would have lasted only for that period of time.

We find interesting the question whether or not salaries or wages earned in the conduct of an illegal business may be considered in determining the loss sustained by the plaintiff in a damage suit. We find no decisions on the subject in Louisiana, but quote the following from Corpus Juris and from American Jurisprudence:

In 17 C.J., verbum "Damages", section 106, page 782, it is said: "Earnings in an unlawful employment cannot be made the basis of recovery."

In 15 American Jurisprudence, verbum "Damages", section 97, appears the following: "No recovery can be had, however, for inability to practice a profession where the plaintiff's practice is unlawful."

In Marsiglia v. Toye et al., La.App., 158 So. 589, we find a case in which the injuries sustained by the plaintiff rather closely resembled the principal injury involved here. There there was a fracture of the arm causing 25 per cent. impairment in the function of the arm and hand and $1,000 was allowed. There was no evidence of permanent impairment.

In Fulmer v. Louisville & Nashville R. R. Company, La.App., 152 So. 148, the plaintiff sustained a fracture of the forearm and an award of $1,945 was reduced to $1,000.

In Hogan v. New Orleans Public Service, Inc., 16 La.App. 637, 131 So. 756, 132 So. 425, plaintiff was awarded $1,500 for a broken wrist.

In Gragnon v. City of New Orleans, 9 La.App. 76, 118 So. 791, an award of $8,-675, which included $2,275 for personal injuries consisting of a broken arm and contusions, was held to be excessive and was reduced to $1,250.

It is obvious that the usual award for a broken arm is substantially less than the amount which was granted plaintiff here. But, in view of the fact that the evidence conclusively shows that the impairment of function here will be permanent, we are inclined to the belief that the amount awarded is not sufficiently in excess of what is usual to justify a reduction.

In view, therefore, of all the circumstances, and bearing in mind the bill of the doctor and other expenses which may have been sustained, we do not think that the amount awarded is excessive.

It is therefore ordered, adjudged and decreed, that the judgment appealed from be and it is affirmed, at the cost of appellants.

Affirmed.