HERBERT L. HULL, Appellant, v. BISHOP-STODDARD CAFETERIA et al., Appellees.

No. 46738.

MARCH 11, 1947.

REHEARING DENIED JUNE 21, 1947.

Raymond E. Hanke and Putnam, Putnam & Putnam, all of Des Moines, for appellant.

Frank W. Davis and Evans, Riley, English & Jones, all of Des Moines, for appellees.

BLISS, J.—On September 17, 1946, an affirming opinion (24 N. W. 2d 364) was rendered by this court. A rehearing was granted to the plaintiff and the cause was resubmitted. The above-noted opinion is withdrawn and is superseded by this one.

On March 7, 1944, plaintiff was injured by a fall into the open shaft of an elevator, from the first floor to the bottom of the shaft in the basement of the Garver Building, a six-story business structure, in downtown Des Moines, owned by the defendant Macon Realty Company, part of which was leased and used as a restaurant by the codefendant, who will be referred to as "Bishop's." The building has a south frontage of 80 feet on Locust Street, abuts on the north-south alley on the west, and on the east-west alley on the north. In the northwest corner of the building, in the angle formed by said alleys, is an elevator shaft extending from the basement floor to the roof and servicing the basement, the sixth floor, and all floors between. The shaft is 7 feet north and south and 7½ feet east and west. On the first floor, immediately east of the shaft and abutting thereon, is what will be referred to as the entry room. It is 7 feet north and south and 9 feet east and west. A door on the east side and one on the south side affords access to the dining room of Bishop's. Access to the east-west alley on the north is through a 5-foot door, in two parts of equal width, hinged on the casings, and swinging inward from the perpendicular center of the opening. The west casing is approximately 3 feet from the northeast corner of the shaft and the east casing is about a foot from the east wall of the entry room. The top of the threshold of this door is about 18 inches above the entry-room floor and two steps connect them.

The brick walls of the building form the west wall, and, apparently, the north wall of the elevator shaft. The east and south walls are made of lumber. The entrance or doorway to the shaft is on its east side in the first-floor entry. That is the doorway through which plaintiff fell and it is the only one particularly involved. There are no doors or barriers of any kind on the elevator itself. The gates and doors which close the openings in the shaft are all a part of the east wall of the

shaft and are fastened to it. At the opening on the first floor is a double door, or rather, two doors of the same size—3′ x 6′ 6″ —hinged to the shaft on their back edges and meeting flush in the middle of the opening. The north one of these doors was not used and was nailed shut. That was its condition on the evening of the injury. Behind or west of these doors, and closing the opening in the east wall of the shaft when down, a slat gate was suspended. It was about 6 feet wide and 5½ feet high, and was made of upright wooden slats bolted to crosspieces at the top, middle, and bottom. The slats were 3 inches wide and were separated by 3-inch openings. It operated like a window, with weighted ropes run over pulleys at the top corners to aid in raising or lowering the gate and to hold it in position when raised. It was not operated by electricity or by any power other than man power. There was a handle at the bottom of the gate on each side to aid in the application of this power. When the gate was completely down, the bottom of it rested on the floor of the room. It could be raised or lowered by any person in the elevator or by anyone on the floor. There was no connection or relation between the operating of the gate and the operating of the elevator. The operating of each was independent of the other. Whether the gate was up or down, or the opening in the shaft where it was suspended was open or closed, had no effect on the movement of the elevator. The elevator could be moved up or down between any or all of the floors, regardless of the position of any or all of the gates on any or all of the floors, or whether they were up or down. And conversely, any gate on any floor could be raised or lowered at any time, regardless of whether the elevator was moving or stationary, or where located. There were no gates or doors closing the openings in the shaft or the elevator which were automatically operated or locked, by any electrical or mechanical devices, which would prevent the opening of a gate or door when the elevator was not at the floor, or would permit the elevator to be moved from a floor when a door was open. To express it more simply, there was no mechanical connection between the elevator and any gate.

There were no windows in the first-floor entry room. The

only artificial light was a 60 watt electric bulb, without a reflector, a little east of the center of and against an 8-foot ceiling. Five photographs of this room and the elevator and its gates and doors were introduced by defendants. These exhibits and the testimony show the entry room was also a place for keeping scrubbing equipment of various kinds and barrels and containers of rubbish. Its walls and ceiling were painted a yellowish-drab color. The floor of the room and of the elevator had a dark, grimy appearance and looked much alike, and the room as a whole, the doors, gate, and contents were much soiled. For a better understanding of the facts, we show here a reproduction of defendants' Exhibit 1, a photograph of a part of the entry room, showing the elevator entrance with the gate down.

On the gate there was, on March 7, 1944, and had been for a long time, a notice, plainly lettered, as follows:

"DANGER
This Gate must NOT
be left open"

When the gate was raised the sign could not be seen. The west end of the steps to the north door may be seen in the lower right-hand corner of the photograph.

The elevator was approximately 7' x 7' x 7'. It had a board floor and a heavy wire mesh overhead in which was an incandescent electric light globe. In the west brick wall of the shaft was a 7' x 7' opening closed by an up-and-down sliding door, which, with a very narrow dock, was used for the transfer of boxes of merchandise and heavier articles to and from the elevator.

Bishop's had a lease upon a part of the first floor—the west 42 feet, which was widened to 63 feet 6 inches at the rear. The lease also covered the corresponding part of the basement. In it were the kitchens, pantry, storeroom, bakeries, lockers, office, and private dining rooms of Bishop's. The lease did not cover the elevator, or shaft, or any part of the equipment, gates, doors, etc., of either. Neither did it cover the entry room on the first floor or the corresponding space in the basement. The lease did cover a part of the fourth floor, which Bishop's used for the storage of merchandise. There were other tenants occupying other parts and floors of the building —a night club or two, a sports arcade, a health farm. Over against the east wall of the Garver Building, about 40 feet east of the leasehold of Bishop's and about 50 feet north of Locust Street, was a passenger elevator which serviced the first and upper floors of the building but terminated a foot and a half above the basement floor.

The lease between Bishop's and the Macon Realty Company, which was in force on March 7, 1944, was for a term of eleven years from January 1, 1936. Counting earlier leases, Bishop's had been a tenant of the property for over eighteen years. Under the lease last mentioned, the Macon Realty Company received a graduated monthly rental plus ten per cent of the annual receipts of Bishop's exceeding a specified sum,

The Macon Realty Company, as owner, retained the custody and control of the elevator shaft in the northwest corner of the building, and also the elevator, the gates, doors, and all appurtenant equipment, and the entry rooms for the common use of itself and all tenants, including Bishop's. The latter used this elevator equipment and service in the operation of its business and the conduct thereof between the different parts of its leasehold, and in the conveyance of merchandise, waste products, etc., and also of personnel. Any tenant or the employees or patrons thereof, or persons doing business with the tenants, were at liberty to and did use the elevator and operate it personally. While there was no evidence that anyone was employed solely to operate the elevator, Mr. Park, Bishop's manager at this place for over eighteen years, testified that an operator was furnished:

"At times, yes. * * *. Yes. Prior to March 7th [1944] you could call for the elevator if it happened to be on some floor on which you were not, and the fireman would usually or ordinarily come up and get you, and run you down. He' was the man in charge of that elevator. Q. So that it may be operated by an operator there furnished by the building or it may be operated by folks that wanted to use it? A. That is right, yes."

The witness had seen the tenants and others using the elevator with and without freight, although he did not always know what the particular business of each was. Under the lease the lessor furnished heat for Bishop's.

The elevator was raised and lowered by cables operated by electricity. No pressure buttons were used. In the southeast corner of the shaft hung a cable which was the means of starting the elevator. If one operating the elevator wished it to go up he pulled down on the cable, and if he wished it to go down he pulled up on the cable. This was the method followed, whether the elevator was at the floor where the one desiring to use it was, or if it was above or below and he wished to bring it to that floor. There was a hand-manipulated latch mechanism on the southeast corner of the elevator through which the cable

operated, which, by adjusting, would stop the elevator at any desired floor.

Plaintiff, fifty-three years old, with his wife and daughter, lived on an acreage near the town of Carlisle. He raised hogs and fed them in part with the scraps and remnants of food from the dining room and kitchen of Bishop's, and from three other places in Des Moines. He also hauled away rubbish and trash from all of these places. He paid nothing for the garbage he received from the three places, but for thirty-seven months preceding his injury he had a contract with Bishop's under which he received all of their garbage, collecting it seven days a week, and paid them $20 a month therefor, and as further consideration hauled away their daily accumulation of trash. He used the first-floor entry room and elevator in removing the garbage and trash from the basement and transferring it over the loading dock to his truck in the north-south alley. He used his own truck and receptacles. He made two trips a day— about 5 p.m. for the trash, and about 6:30 p.m. for the garbage. On the day of his injury he came for the garbage about the usual time. He parked his truck on the east side of the alley, just south of the loading dock, and came into the first-floor entry room through the north door. The ceiling light was on, and while, as plaintiff testified, "It has never been a bright light," it was sufficient to enable him to see. The south half of the double door was open and the gate was down or closed. By looking between two slats he could see that the elevator was in the basement. By pulling on the cable he brought the elevator to the first floor, opened and then closed the gate, and descended in it to the basement. The light was on in the wire mesh at the top of the elevator. After reaching the basement, plaintiff assembled his cans of garbage near the basement entrance to the elevator. Cleo Andrews, an employee of Bishop's, who then had completed his day's work for Bishop's, stepped on the elevator to go up and plaintiff joined him, saying that he would go to the first floor and go out and move his truck up to the loading dock. Andrews closed the gate and operated the elevator to the first floor, where he stopped it, raised the

gate, and plaintiff stepped off and walked directly to the north door. He saw no more of Andrews and had no knowledge of whether he went to another floor or got off at the first floor. Andrews, as a witness for the realty company, testified that after the plaintiff left the elevator he (Andrews) lowered and closed the gate, and then took the elevator to Benson's Night Club on the fifth floor, where he was employed three nights a week; that he left the elevator at the fifth floor, closed the gate, and went into the club, where he stayed about twenty minutes, and then came out and found the elevator and gate as he had left them, and took the elevator to the basement.

Plaintiff moved his truck to the dock and in about five minutes returned to the entry room by the north door. It was snowing and quite windy and cold. As he opened the east half of the door, a young lady employee of Bishop's was standing about the center of the door, buttoning her coat preparatory to leaving. She said "Hello, Herb," and he told her to button up well. Noting she wore neither galoshes nor stockings, he remarked: "No stockings. That is the way my girl goes." The conversation was as he stepped past her to her right, as she faced the door, and walked approximately 9 feet—a matter of three steps—directly southwest to the southeast corner of the shaft. When he opened the north door of the room he observed instantly that the gate to the elevator entrance was raised. As he stepped toward the elevator he looked again and saw the gate was raised and he thought the elevator was at that floor. When he reached the south side of the entrance he reached for the cable with his left hand to start the elevator, and stepped forward with his right foot, with the expectation of placing it on the floor of the elevator, but it was not there and he fell to the bottom of the shaft.

Plaintiff testified that in the thirty-seven months that he had come twice daily for the trash and garbage he had never before seen the gate up when the elevator was not at the floor. There was testimony by others that they had seen the gate raised when the elevator was not at that floor. But that had not been the experience of the plaintiff. Nor had it been the experience of the young lady he had met at the door. As a witness

for the Macon Realty Company—she had married and her name was then Mrs. Harley Hill—she testified that in the more than two years she had worked at Bishop's she had never seen the gate at the first floor up when the elevator was not there. She corroborated the plaintiff in his testimony, except she testified that the gate was closed when he attempted to use it and fell. Cleo Andrews, a witness for the realty company, corroborated plaintiff respecting his assembling of the garbage and his going with him in the elevator to move his truck. Plaintiff testified that the "not very bright" light in the elevator was on, as was also the light at the ceiling of the entry room, which reflected "Just somewhat—not much" into the elevator itself. Andrews corroborated him, testifying that "the light in the entry way was not a real bright light, it was more on the dim side."

Plaintiff's original petition, in numbered paragraphs, alleged: in (1) the relationship of the defendants as lessor and lessee, the general description of the building and of the elevator in the northwest corner, its equipment and appurtenances, the manner of its operation; in (2) and (4) the work plaintiff was performing and the manner of his injury; in (3) that while the elevator was constructed and maintained by defendants as a freight elevator, plaintiff was, when injured, riding on it as a passenger, as he and other employees of Bishop's had often done, and "[said] elevator was commonly and frequently used as a means of carrying passengers. That the defendants [and either of them, or both of them] knew or should have known that it was being so used and that by its use, had become a passenger elevator"; in (5) that the shaft was dark and obscure, and the light in the room did not reflect sufficiently into the shaft to warn plaintiff that the elevator, which he had left only shortly before, was not there; in (6) that said "elevator was, because of its use, a passenger elevator within the meaning of the law, and as such it had been removed from the first floor to the fourth floor of the building without the gate being down across said opening in the shaft, for the reason that the gate interlock was not so constructed or equipped so as to operate mechanically or electrically, or electromechanically, which would

prevent the elevator car from being operated without the hoist way door being locked on the floor at which the car was standing, nor in any other manner, as provided for in Section 1684.1 of the 1939 Code of Iowa, and because of the failure to provide such safety measures the defendants and each of them, or either of them charged with this statutory duty did not provide safety measures required of them for the safety of passengers, and more particularly this plaintiff [so using the same], in making it safe for the purpose for which it was used, as provided for in Section 1678 of the 1939 Code of Iowa, (excepting mine elevators)''; in (7) that each or both of said defendants were negligent in one or more of the following particulars: (a) failure to have a guard across the opening in the elevator shaft at the time in question; (b) failure to have sufficient light; (c) failure to furnish and keep an experienced operator in charge of elevator; (d) ''failure to have interlocking gates or doors at the entrance to the elevator shaft at the place in question so constructed as provided for in Section 1684.1 * * * so as to render it safe for its use as a passenger elevator, and for the protection of the plaintiff, who rightfully did so intend to use the same at the time and place in question''; in (8) ''* * * that any one or more of the acts of negligence as above charged and alleged was the proximate cause of the plaintiff's injury and resulting damage thereto''; in (9) that plaintiff was free from contributory negligence; in (10) the damages.

Bishop's, in its original answer, admitted in substance the allegations in (1) of the petition, but denied any proprietary interest in or dominion or control over the elevator, shaft, or entry room, and alleged that they ''were owned, maintained, operated, equipped and furnished by persons other than this defendant, for the use of this defendant and other tenants in said building and persons entitled to the use thereof.'' It denied any negligence on the part of itself or of its employees that was the proximate cause of the injuries, and denied the allegations in all other numbered paragraphs.

The Macon Realty Company admitted in general the allegations in (1) of the petition and denied all others. Each defendant amended its answer as follows:

"For further answer and by way of affirmative defense, this defendant alleges the fact to be that plaintiff knew, or as a reasonably prudent person of his age and experience, should have known of the condition of the elevator in question, its shafts and gates, and any danger that may have existed at the time of plaintiff's injuries was obvious and apparent to plaintiff, and by reason thereof plaintiff assumed all of the risks incident to the use of said elevator, its shaft and gates."

Plaintiff's reply denied all affirmative allegations in the answers.

At the close of plaintiff's testimony a photostatic copy of the lease between the defendants was admitted by stipulation, and by agreement, in oral argument, the exhibit was submitted to this court. It was further stipulated at the trial by the parties "that at the time or times referred to in this case the elevator involved herein, its shaft, gates and equipment, and the first floor entrance or passageway thereto, were reserved by the lessor for the common use of the lessor and all of the tenants of said building and remained under the control, maintenance and possession of the lessor; and that the lessee Bishop-Stoddard Cafeteria had no possession or control thereof or rights with respect thereto except the right to the use thereof in common with the lessor and the other tenants in the building; and that these facts exist as a part of the rental agreement between the defendants."

Each defendant moved for a directed verdict at the close of plaintiff's evidence. In substance, the grounds of the motion of the realty company were: 1. No proximate negligence was shown against either defendant. 2. It was affirmatively shown that each defendant was free from negligence. 3. Freedom from contributory negligence was not shown by plaintiff. 4. Contributory negligence was affirmatively shown. 5. Neither defendant owed plaintiff any duty to maintain the premises in a safe condition, since he was an independent contractor. 6. Plaintiff was familiar with the elevator and its equipment and manner of operation, and knew and assumed the dangers and risks incident to their use, and was thereby precluded from

recovering for his injuries. 7. Any verdict against the defendants or either of them would have to be set aside by the court as contrary to the law and the evidence.

Bishop's adopted all grounds of the motion of the realty company, and added these:

"[a.] This defendant lessee is not liable to the plaintiff except for palpable negligence on its part, and the evidence wholly fails to show any palpable negligence on the part of this defendant. [b.] The premises, or that portion thereof involved in the plaintiff's cause of action, are shown to have been in the possession and control of the defendant lessor and not within the possession or control of the defendant lessee, and any defects therein or negligence claimed in connection therewith are not chargeable to this defendant as lessee."

In sustaining this motion, the court said:

"Let the record show, Mr. Reporter, that as to the motion made by the defendant Bishop-Stoddard Cafeteria the court feels that this motion for a directed verdict should be sustained. The evidence fails to show any negligence on the part of this defendant that was the proximate cause of the injury, and in view of the provisions of the lease this defendant would not be liable except from palpable neglect on its part, and that has not been shown. The elevator and the shaft and the passageway and areaway were all under the control and dominion of the defendant Macon Realty Company. This passageway and elevator were used by all of the tenants in common in that building, as well as the defendant Macon Realty Company, and there was no obligation on the part of the defendant Bishop-Stoddard Cafeteria Company to maintain the premises in a safe condition or to repair them. * * * As to the other defendant the motion at this time will be overruled."

The jury then rendered a verdict for Bishop's under direction of the court.

At the close of the realty company's case, which consisted of the testimony of Cleo Andrews and Mrs. Hill, it renewed its motion to direct, after adding four grounds. These additional

grounds were: (1) The sustaining of its codefendant's motion to direct necessarily required the sustaining of the realty company's motion (2) the undisputed testimony showed that Andrews closed the gate, and if it was thereafter opened by some' unknown person, this defendant is not liable therefor (3, 4) if Andrews left the gate open the intervening time was too short to apprise this defendant thereof.

The separate motions of the defendants to direct a verdict for each overlapped, and each adopted allegations of the other. Some of plaintiff's assignments of the court's errors expressly directed to Bishop's also expressly applied to the realty company, to wit: 1. Error in sustaining motion generally, contrary to Rule 118 of the Rules of Civil Procedure. 2, 7. Error in finding defendants free from negligence. 3, 4. Error in finding plaintiff contributorily negligent. 5, 10. Error in finding the plaintiff knew and assumed the risk of the use of the elevator, gates, shaft, or appurtenances, precluding recovery. 8. Error in finding that under the law and evidence a verdict against either defendant would have to be set aside. 9. Error in finding that the evidence must show *palpable* negligence, as against Bishop's. 11. Error in finding that Bishop's was not in possession of or control of the part of the premises involved herein —the elevator, shaft, and appurtenances—so that negligence was chargeable against it. 12. Error in finding that plaintiff as an independent contractor chose his own place to work and therefore assumed the risk as a matter of law.

In addition to the aforesaid errors the plaintiff assigned the following errors against the realty company, to wit: error in finding plaintiff guilty of contributory negligence, and error in finding that he had assumed the risk, precluding him from recovery.

I. Although each motion to direct contained several grounds, all of which the court sustained by its general ruling, it specifically based its ruling on the motion of Bishop's upon the ground that no proximate negligence on its part was shown. In the ruling upon the motion of the Macon Realty Company the grounds specifically sustained were the contributory negli-

gence of, and the assumption of risk by, the plaintiff. There was merit in each error assigned respecting each defendant, and prejudicial error against the plaintiff in sustaining the motions.

II. Plaintiff assigned error because the court disregarded Rule 118 of the Rules of Civil Procedure, which requires that a motion or other matter involving separate grounds or parts shall be disposed of by separate ruling on each, and not sustained generally. Defendants contend that a fair construction of Rules 117 and 118 is that the latter Rule does not apply to a motion to direct a verdict but only to motions "before the trial of the issues on their merits," using the language of Rule 117(d). They further urge that "A motion for a directed verdict is *part* of the trial; in a sense it is a demurrer to the evidence." (Italics ours.) A demurrer, under Rule 67, is no longer a part of our procedure. Furthermore, Rule 117(d) is but a subdivision of Rule 117, and the definition therein of "a motion" is solely for the purposes of Rule 117 as a whole. This Rule has to do with the making up of the issues and not a motion to direct a verdict. A "motion" is defined in Rule 109 as an "application made by any party or interested person for an order [defined in Rule 119]. It may contain several objects which grow out of, or are connected with, the action." Furthermore, Rule 118 specifically states that, "A motion, or *other matter* involving separate grounds or parts, shall be disposed of by separate ruling on each and not sustained generally." (Italics ours.) The italicized words plainly indicate the intention not to limit the requirement to "motions" as such. The Rule is a most wholesome and salutary one, and requires the court or judge to specifically state the ruling on each ground alleged. The reason and purpose of the Rule is thus stated in the "Advisory Committee Comment":

"This is new. There is much confusion as to the right of a party to specific rulings. Under the doctrine that a general ruling sustaining a motion is deemed to sustain every ground, no matter how absurd, it is necessary in review of such rulings to argue every ground, even those the judge never actually thought were good. Both the appellate court and the parties should be entitled to know what grounds are upheld, thus short-

ening the later phases of the matter. No one is harmed by this.'' Cook's Iowa Rules of Civil Procedure, 248.

The contentions of defendants, above noted, are without merit. Equally unsound is defendants' argument that since an appellee, without cross-appeal or assignment of error, may protect his judgment, on appellant's appeal, by showing that the motion ruled on by the trial court should or could have been sustained on other grounds not specifically passed upon by it (see Shaw v. Addison, 236 Iowa 720, 733, 734, 18 N. W. 2d 796, 803, 804, and numerous authorities cited), a motion to direct a verdict is not within the scope or intendment of Rule 118. An appellee may or may not seek the benefit of the well-known Rule above noted, and an appellant ought not be compelled to argue every ground of a motion in his opening argument in anticipation that appellee in his answering argument may invoke the Rule as to some or all of the grounds not specifically ruled on by the trial court. Motions to direct verdicts were apparently particularly in the minds of those who drafted Rule 118. There is nothing to the contrary in Humphrey v. City of Des Moines, 236 Iowa 800, 20 N. W. 2d 25, or State v. Otterholt, 234 Iowa 1286, 15 N. W. 2d 529.

The trial court should not have disregarded the Rule. Without holding that such disregard may never be reversible error, it is our decision that it is not so prejudicial in this case as to require a reversal.

III. The motions of the defendants to direct a verdict for each were made and submitted at the close of plaintiff's case. Bishop's motion was ruled upon first and sustained, and the motion of the realty company was then overruled. At that time, with permission of the court, the plaintiff amended its petition, as follows:

''By adding to paragraph 7, page 5 of plaintiff's petition, and after paragraph (4) thereunder the following: '(e) That the defendant in violation of Section 1678 of the 1939 Code of Iowa failed to provide a gate across the opening to the elevator shaft which would close automatically and remain closed so as to guard the opening to the shaft when the elevator was

not at the first floor landing in said building at the time and place in question as hereinbefore complained of. Further, that the defendant failed to have the so-called hoistway and well hole in which the elevator operated so constructed, guarded, and equipped and maintained and operated as to render it safe for the purposes for which it was used, said elevator not being under the jurisdiction of the Mine Inspector, but being an elevator which was constructed as a freight elevator, and was at all times herein referred to used either in whole or in part as a freight elevator. (f) * * *' '' (This was an allegation that the closing of the north half of the double door obscured plaintiff's view of the entrance to the elevator.)

■■ The printed record, and the amended pleading as filed, do not indicate that the amendment applied to but one defendant, although the word "defendant" is used in the singular in subparagraph (e). On page 5 of plaintiff's first printed argument there is this reference to the amendment: "By amendment as to the defendant, Macon Realty Company." But on page 12 of that argument is: "Point IV: Defendants owed plaintiff the duty of furnishing him a reasonably safe place to work and to use ordinary care for his safety, both as a common law duty and a statutory duty. Sec. 1678, 1939 Code of Iowa * * * [and other authorities]." And the argument under "Point IV," pages 32–40, concerning section 1678, is directed to both defendants. On the original submission Bishop's did not discuss the matter, but on the resubmission it contends that it was never charged with negligence by violation of said section 1678. Plaintiff argues to the contrary. The contention of Bishop's is not convincing. While the charges of negligence stated in paragraph 7 of the original petition do not include a breach of said section 1678, both defendants are clearly charged with negligence by violation thereof in paragraph 6. No attack was made upon the petition. The petition sufficiently charged violation of section 1678 by each defendant, without amendment. The fact that a directed verdict was returned before the amendment to the petition was filed is of no material consequence. The action was against both

defendants, and the amendment was to conform the pleadings to evidence introduced against both defendants, and was proper in making a record for further proceedings, or appeal.

IV. Plaintiff alleged that, while the elevator was constructed primarily for the carriage of freight and merchandise, it was also extensively used in carrying persons. We will consider the elevator, first, strictly as a freight elevator. Plaintiff charged each defendant with negligence against him in violating the provisions of section 1678, Code, 1939, by failing to provide such safety measures as that section required to make the elevator and its equipment and appurtenances safe for the purposes for which it was used.

Section 1678, supra (section 104.1, Code, 1946), is as follows:

"General equipment. Every elevator and elevator opening and machinery connected therewith in every elevator, hoistway, hatchway, and wellhole shall be so constructed, guarded, equipped, maintained, and operated as to render it safe for the purposes for which it is used."

It expressly excepted mine elevators.

Section 1679, Code, 1939 (section 104.2, Code, 1946), provides that every person, firm, or corporation operating an elevator in violation of the provisions of the chapter shall be deemed guilty of a misdemeanor and subject to the penalty provided in the section.

These sections were, respectively, sections 2 and 6, slightly modified, of chapter 18 of the Laws of the Fortieth General Assembly, enacted in 1923, for the purpose of regulating the construction, installation, equipment, maintenance, and operation of elevators, and providing for the adoption of a code of standards, rules, and regulations. At that time it was the only safety statute applying to elevators. It applied to elevators in general. It specified neither freight nor passenger elevators, but applied to elevators of all kinds, except those under the jurisdiction of the state mine inspector. The Forty-first General Assembly, in 1925, by section 4 of chapter 31 of its laws, enacted what is now section 104.4, Code, 1946 (section 1684.1,

Code, 1939), applying to passenger elevators. But no change was made in said section 1678. (See Report of Attorney General, Iowa, 1925, 1926, pages 122–124, on this elevator legislation.)

Section 1678 is very broad and general. It designates no particular type of elevator nor the particular use thereof. It applies to *every* elevator and *every* elevator opening, hoistway, etc., and to the machinery and equipment thereof. No exceptions or exemptions, other than mine elevators, are specified. Necessarily it applied to this elevator, its shaft, operating mechanism, guards, etc., in the Garver Building. Neither defendant contends that it does not apply. The manner and method by which the elevator, etc., shall be constructed, guarded, etc., are not specified with any particularity. But the command of the statute is that an elevator and its equipment must be *"so"* constructed, guarded, equipped, maintained, and operated, "as to render it *safe* for the *purposes for which it is used,"* whether that use be the carriage of property, persons, or garbage.

The Macon Realty Company owned, controlled, maintained, and operated this elevator. It used it as such owner. It granted to its tenants the right and opportunity to use it. Certainly it came within the provisions of said sections 1678 and 1679. Bishop's, as a tenant, had a right to and did use the elevator. It operated it between the basement, the first floor, and the fourth floor, and in the conveyance of property in and out and over the loading dock. Its manager and employees so used and operated it. Its use and operation imposed on it a duty and responsibility under section 1678 toward those within the protection of the statute. Certainly it also was an operator under section 1679.

We have already set out in detail the manner in which this elevator, elevator hole, elevator opening, machinery, and appliances connected therewith were constructed, guarded, equipped, maintained, and operated. Whether all of these things had been done, as specified in and as required by the statute, was a question of fact for the jury, and not of law for the court. That issue should have been submitted to the jury

by the court with proper instructions advising them of the provisions of the statute and the meaning thereof. In Kirchoff v. Hohnsbehn Creamery Supply Co., 148 Iowa 508, 511, 512, 123 N. W. 210, 212, the statute involved was the Factory Act, then section 4999-a2 of the 1907 Code Supplement, section 1487 of the 1939 Code (section 88.6, Code, 1946). That section required that all saws, etc., and machinery of every description therein shall be "properly guarded." As in the case before us, the statute was not specific. Of it the court said: "What such guard shall be is not specified save in exacting that it *shall be proper*." (Italics ours.) The court further said:

"Was this planer 'properly guarded' within the meaning of the law? If the proof was such that but an issue of fact was raised, the jury should have been advised of the provisions of the statute, and instructed what would constitute a proper guard. If it appeared conclusively that the machine was not 'properly covered,' it should have been so told, and that in permitting its operation in that condition the defendant was guilty of negligence."

In Stephenson v. Sheffield Brick & Tile Co., 151 Iowa 371, 377, 379, 130 N. W. 586, 588, 589, the same statute was involved as in the Kirchoff case, supra. The court said:

"It is contended that there is no testimony that the machine was not properly guarded. The kind of guard to be used is not defined by statute; but we have said that it must be such an one as reasonably accomplishes its purpose. Kirchoff v. [Hohnsbehn] Creamery [Supply] Co., supra."

In the Stephenson case, as in this case, there was an attempt to provide a guard. The court held it was a question for the jury whether such guard was a proper one. In upholding the instruction respecting the guard, the court said:

"The law does not state what the guard must be. It says that such machinery must be provided with proper guards, and, in the absence of definition, the question is one of fact for the jury, unless the case be so plain as to call for an expression

from the court that the machine either was or was not properly guarded as a matter of law.''

The entire situation and the circumstances involving the elevator, its construction, gates, operation, attending dangers, were all so fully detailed in the record that the determination of whether the defendants or either of them were negligent in failing to comply with the requirements of section 1678 was a question of fact for submission to the jury under proper instructions. In Gordon v. Chicago, R. I. & P. Ry. Co., 129 Iowa 747, 755, 106 N. W. 177, 179, defendant contended that negligence in the construction of the roadbed was not a proper matter for the jury since it involved engineering and mechanical skill. In answer, the court said:

''If inquiry into the construction of the road cannot be made by a jury because it may involve questions of engineering or mechanics or scientific or expert discussion, then, for equally good reason, can inquiry into the reasonable safety of the place of work be suppressed in substantially every action brought by servant against master [citing many cases].''

The slat gate used as a guard for the elevator was of such nature and so attached and operated that its use as a safety appliance and a protection against danger could be wholly nullified by anyone. It could be used or not used at all as anyone operating the elevator might see fit. In Nodland v. Kreutzer & Wasem, 184 Iowa 476, 481, 482, 168 N. W. 889, 890, 891, the mechanism requiring a guard was a power-operated circular ripsaw. Some attempt was made to provide one. The court said:

''The design of the legislature evidently was to provide the largest possible safety and protection to employees working in and about dangerous machinery. *The duty here imposed upon the master is not discharged by providing a guard or shield that may be installed and used, or laid aside at the whim or caprice of an employee.* He *must* see that such machinery is properly guarded, and failure to perform this duty amounts to negligence.'' (Italics ours.)

The issue was held to be for the jury. While the statute referred to in the last-cited case was section 4999-a2, 1913 Supplement, section 1487, Code of 1939 (section 88.6, Code, 1946), the principle stated in the case applies with equal force to each defendant, under the provisions of section 1678, Code of 1939.

The trial court held, as a matter of law, that neither defendant was negligent. Certainly an elevator shaft, hoistway, wellhole, or other hole of like nature, when unguarded or unprotected by a barrier, on its face is such a potential danger into which a person may fall to his injury that no court should say conclusively that it evidences no negligence on the part of those responsible for the condition. Even the defendants, or one of them, conceded that such a condition was unsafe. This admission against their interest was made by posting on the gate the warning of danger and the command to keep the gate closed. They knew that many used the elevator. They knew and were held to know that section 1678 required the elevator and its appurtenances to be *so* guarded as to make it safe for the use and purposes to which they were put. Their only compliance with the statute was to suspend a gate over the shaft opening, which could be closed or left open, raised and left raised, by any or all persons about the place. A board across the opening, loosely bolted at one end and dropped into a slot or bracket at the other end, would have been quite as much protection. Indeed, it probably would have been more certain protection, since a person raising the board would very likely replace the loose end in the slot rather than hold it. The double doors were of little importance. One door was nailed shut, and the other, so far as the record shows, was never closed. After everything was done by the defendants they still realized that it was not safe and that there was danger. And yet, notwithstanding the realization of danger which the condition brought to the defendants, the court inconsistently held that the condition *absolved* them from negligence *as a matter of law,* while it held the very same condition was so obviously dangerous that it *convicted* plaintiff of negligence and assumption of the risks of defendants' negligence *as a matter of law.*

Such safety as there was depended solely on the human

674

element, on what any individual might or might not do. It is not probable that the legislature intended the guarding to be so largely limited. This elevator was in a busy section of Des Moines, in a building used daily by a large number of people, many of whom used the elevator. Its location was quite different from one in a warehouse or a storage building on the outskirts of the city, used largely by employees. Whether what the defendants did was a substantial compliance with section 1678, or was reasonably sufficient to make the elevator and its equipment safe for the purpose for which it was used—the subject being one of which the jurors may be presumed to exercise intelligent, independent judgment—was clearly for a jury to determine.

V. Liability on the part of the defendants to the plaintiff is predicated on their failure to perform some duty which they, or either of them, owed to him, proximately resulting in his injury. Did they, or either of them, owe him a duty, which was violated by their noncompliance with said statutory provisions? Each of them clearly owed him such a duty. We will first consider the duty of Bishop's. Neither the petition nor the answers designate by name the relationship of the plaintiff and Bishop's. Both motions to direct alleged that plaintiff was an independent contractor. There is nothing to indicate that the trial court gave any consideration to the nature of this relationship. In his first printed argument plaintiff's attorney expressed the conclusion of law that he was an independent contractor. There was no evidence so designating him. We question the soundness of such conclusion. It would be more correct to say that he was a patron or customer of Bishop's, buying feed for his hogs and paying therefor with cash and services, as he might buy corn from a grain dealer with like payment, and load and haul it to his feed lot. The label put on the relation is of little materiality. Whether he was an independent contractor or a patron of Bishop's, he was rightfully on the premises, and rightfully using the elevator and its appurtenances, with Bishop's express invitation. As such invitee, Bishop's owed him the duty of exercising reasonable and ordinary care

in the operation and maintenance of its place of business to avoid injuring him. By the terms of its agreement or arrangement with Bishop's, the realty company leased specified portions of its building to Bishop's for occupancy and use as a restaurant, and also granted to said lessee the right to use and operate the elevator and its appurtenances and equipment, in common with the lessor and other tenants, so far as the proper operation of its business required. By such use, Bishop's made the elevator, its shaft, gates, equipment, and entry room a part of its place of business, which it furnished and directed the plaintiff to use. Having done so it was incumbent on it to use ordinary care to make and maintain the place where plaintiff worked, including the elevator and its appurtenant instrumentalities, reasonably safe for him. For Bishop's to allow conditions to exist which proximately caused injury, the injury to plaintiff would be a breach of that duty. A duty which is imposed by law and not by contract. See Sulhoff v. Everett, 235 Iowa 396, 400, 16 N. W. 2d 737, 739; Mann v. Des Moines Ry. Co., 232 Iowa 1049, 7 N. W. 2d 45; Keeran v. Spurgeon Mercantile Co., 194 Iowa 1240, 1242, 191 N. W. 99, 27 A. L. R. 579; Nelson v. F. W. Woolworth & Co., 211 Iowa 592, 601, 231 N. W. 665; Low v. Ford Hopkins Co., 231 Iowa 251, 1 N. W. 2d 95; Noyes v. Des Moines Club, 178 Iowa 815, 821, 160 N. W. 215, 218.

Such duty was owed plaintiff by Bishop's without regard to whatever relation, rights, duties, or obligations existed between the codefendants, to which he was a stranger, and regardless of any duty owed by the realty company to plaintiff.

We have already noted, and will not repeat, the court's ruling in sustaining the motion of Bishop's to direct, for the expressed reason that Bishop's was liable only for *"palpable neglect"* toward plaintiff. We have found no such provision in the lease, but if it is there, it would not serve to alter or avoid the duty owed by Bishop's to the plaintiff under well-recognized principles of law. The standard of care and duty required of Bishop's is as set out above, and its lack of care could not have been extended to palpable neglect with impunity. This duty it could neither delegate nor contract away

to the realty company, and thus absolve itself from liability to plaintiff. See Springer v. Ford, 189 Ill. 430, 59 N. E. 953, 52 L. R. A. 930, 82 Am. St. Rep. 464, 465; Creek v. Nonpareil Inv. Co., 66 Colo. 550, 185 P. 473; 39 C. J., Master and Servant, section 537.

 VI. The Macon Realty Company also owed a duty not to injure plaintiff by its negligence, and the measure of its care in that respect was the same as that of Bishop's. The realty company does not deny that plaintiff was rightfully on its premises and was rightfully using the elevator. While it shared its possession and use of the elevator and its appurtenances with Bishop's and the other tenants, it retained the superior control, possession, and maintenance thereof. By its agreement with its lessees they and their invitees had the right to use this property which it so reserved. Bishop's was such a tenant, and plaintiff as its express invitee became the implied invitee of the realty company. It therefore owed plaintiff reasonable and ordinary care to make the elevator and its appurtenances reasonably safe for him.

The defendants were under a common-law and a statutory duty to so guard, maintain, and operate the elevator and its equipment as to render it reasonably safe to plaintiff for the purposes for which they were used. A case very clearly in point, against each defendant herein, is Burner v. Higman & Skinner Co. (lessee) and J. P. & T. S. Martin (owners and lessors), 127 Iowa 580, 585, 590, 103 N. W. 802, 804 et seq. The case arose and was tried before the adoption of the elevator legislation herein discussed. But, under a fact situation quite similar to the one in this case, the court held both the owners and the tenant, who was directly involved, liable at common law to the plaintiff for failure to properly guard the entrance to a freight elevator. The owners gave the lessees of the building the right in common with each other to use the elevator, but retained control over it. The owner of goods, which the lessee, above named, was storing for hire, sent a drayman to remove the goods. The ground-floor entrance to the shaft had a sliding door bearing the notice, "Keep the Door

Closed,'' which was concealed when the door was opened. There was also a movable 2x4 bar across the opening. The door was open and the bar not in place, and the plaintiff, being unfamiliar with the place, fell to the bottom of the shaft. In reversing the trial court for directing a verdict for the lessee and the owners, the court said:

"Plaintiff was impliedly invited by the defendant the Higman & Skinner Company to enter the premises. They undertook to store goods for plaintiff's employer, and manifestly invited this employer or his representative to come upon the premises to get the goods. * * * Presumptively the one who occupies premises is liable to one who is negligently injured while rightfully thereon. In some cases the landlord may also be liable, either individually or jointly with his tenant. The reason for the rule is that the tenant, and not the landlord, was, at common law, in the absence of a covenant, bound to keep the premises in repair, in so far as strangers to the lease are concerned. There is also a social duty resting upon one who occupies premises to keep them in a reasonably safe condition for those whom he invites to come thereon. The landlord, as a general rule, however, has violated no duty which he owes to third persons, having exonerated himself when he lawfully committed the premises to the care of a tenant. *To this general rule of non-liability on the part of the landlord there are exceptions—for instance, where the landlord retains control over the premises, or the part thereof where the injury occurred, as a passageway or elevator. This exception also applies when the landlord is in joint control of the property with his tenant.* * * * *While it was not a passenger elevator, yet, as the upper floors were used largely for storage, it was known by the lessee, and by the lessor as well, that many people would come to the rear of the building, and use the elevator for the purpose of getting these goods.* * * * By the terms of the leases, the lessees simply had the right in common to the use of the freight elevator. The landlord did not part with his control thereof * * * as he granted nothing but the right to the use thereof. * * * It was as much the duty of the Higman & Skinner Company, as of

any other tenant, to see that this outside elevator door was closed, and the bar put in place. Either this was not done, or some one of the tenants had early in the morning opened the door, raised the bar, and used the elevator proper above the first floor * * * The elevator was for the common use of all of the tenants. None of them had exclusive control thereof. *In such cases it is generally · held that a landlord is liable with the particular tenant extending the invitation, on the theory that it is the duty of the landlord to keep the property so used in a reasonably safe condition.* [Citing authorities.]'' (Italics supplied.)

In Noyes v. Des Moines Club, supra, 178 Iowa 815, 822, 160 N. W. 215, 218, the court said:

''Negligence always rests upon some duty which the party charged owes to the injured person. One who has control of a building has a duty to those who come upon the premises by invitation, express or implied. He violates that duty when he negligently allows conditions to exist, the existence of which imperil the safety of those who so come upon his premises.''

It is said in II Shearman and Redfield on Law of Negligence, section 719:

''Where they [the elevators] remain under the control of the owner of the building, he is liable to his tenants for any defect in them, their appointments, or their management, which reasonable care and vigilance would have prevented.''

The principle of law stated in Burner v. Higman & Skinner Co., supra, 127 Iowa 580, 585, 103 N. W. 802, and italicized in the quotation therefrom set out above, has the support of all authorities. The rule, as stated in II Restatement of the Law, Torts, section 360, is:

''A possessor of land, who leases a part thereof and retains in his own possession any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sub-lessee for bodily harm caused

to them by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe.''

Other decisions and authorities supporting the rule that the landlord under such circumstances is liable to the lessee, or to one rightfully on the premises through the lessee, are: Racine v. Morris, 201 N. Y. 240, 94 N. E. 864; McLaughlin v. Armfield, 58 Hun 376, 12 N. Y. Supp. 164; Parker v. Barnard, 135 Mass. 116, 46 Am. Rep. 450; Looney v. McLean, 129 Mass. 33, 37 Am. Rep. 295; Campbell v. Portland Sugar Co., 62 Maine 552, 16 Am. Rep. 503; Andrews v. McCutcheon, 17 Wash. 2d 340, 135 P. 2d 459; Wool v. Larner, 112 Vt. 431, 26 A. 2d 89; 1 Tiffany, Landlord and Tenant, 664, section 98; Shoninger Co. v. Mann, 219 Ill. 242, 76 N. E. 354, 3 L. R. A., N. S., 1097; Nelson v. Hokuf, 140 Neb. 290, 299 N. W. 472; Reiman v. Moore, 42 Cal. App. 2d 130, 108 P. 2d 452; Murphy v. Illinois State Tr. Co., 375 Ill. 310, 31 N. E. 2d 305; Horvath v. Chestnut Street Realty Co., Mo. App., 144 S. W. 2d 165; Soldano v. New York L. Ins. Co., La. App., 196 So. 521; McCloskey v. Salveter & Stewart Inv. Co., 317 Mo. 1156, 298 S. W. 226; Gordon v. Cummings, 152 Mass. 513, 514, 25 N. E. 978, 979, 9 L. R. A. 640, 23 Am. St. Rep. 846; Walker v. Dante, 61 App. D. C. 175, 58 F. 2d 1076; Burelle v. Pienkofski, 84 N. H. 200, 148 A. 24; Johnson v. Prange-Geussenhainer Co., 240 Wis. 363, 2 N. W. 2d 723, 726 (plaintiff was a passer-by); Bernstein v. Karr, 22 N. J. Misc. 1, 34 A. 2d 651; Sawyer v. McGillicuddy, 81 Maine 318, 17 A. 124, 3 L. R. A. 458, 10 Am. St. Rep. 260; Donohue v. Kendall, 18 Jones & S. [50 N. Y. Super. Ct.] 386; Siggins v. McGill, 72 N. J. Law 263, 62 A. 411, 3 L. R. A., N. S., 316 (see annotation), 111 Am. St. Rep. 666; LaPlante v. LaZear, 31 Ind. App. 433, 68 N. E. 312; Peil v. Reinhart, 127 N. Y. 381, 27 N. E. 1077, 12 L. R. A. 843; Binnicker v. Adden, 204 S. C. 487, 30 S. E. 2d 142, 145; Starr v. Sperry, 184 Iowa 540, 167 N. W. 531.

VII. There was considerable testimony that for many years this elevator had been used extensively for conveying persons

680

who were not engaged in moving merchandise. Plaintiff testified that he, with the manager and other employees of Bishop's, had used the elevator when the mission had no connection with carrying property; that he had many times seen others doing the same thing; that he had seen many people in ordinary street clothes riding the elevator from one floor to the other. A laundryman testified that he had used this elevator in connection with his work many times over a period of twenty years, with and without laundry, and had seen other people riding the elevator when it had no freight; the people from the club and employees would come down on the elevator without anything except themselves and get off and leave the building; he saw people using it from Benson's Club and the Hermit Club, some were employees and others were not; some were bootleggers. It was conceded that another witness would have given like testimony if called. Mr. Park, Bishop's manager for almost twenty years, testified to the practice of the fireman bringing the elevator on call to ''get you and run you down,'' and of seeing other people, tenants and employees and people doing business with the tenants, using the elevator when not carrying freight. Andrews, an employee of Bishop's, used the elevator in going to and from Benson's Club on an upper floor in connection with his work at the club. The jury could find this promiscuous use of the elevator for carriage of persons must have been known to each defendant. Defendants put on no witnesses to testify to the contrary.

In considering what safety measures were required and proper under section 1678 this testimony cannot be ignored. It indicated one of the ''purposes'' for which the elevator was being used. It was a purpose and use reasonably calling for different means and manner of guarding and equipping an elevator, and a higher degree of care in its operation, than for an elevator used only for freight. It had a definite bearing upon the fact issue of whether the defendants had complied with section 1678. The jury should have been given the opportunity to consider it.

It is significant that section 1678 was passed by the Fortieth

General Assembly and became a law, and that, although later elevator legislation was enacted, it stands today as it was originally adopted. It is very evident that general assemblies which have followed the Fortieth and have not changed the section have thereby clearly indicated their intention that the nature of the construction, guarding, equipping, maintaining, and operating required by the section to make the elevator safe should be viewed and determined in the light of its purpose and use. Whether the slat gate which could be used or not, used as any person about the elevator might see fit, and whether the construction, equipment, guarding, etc., as shown by the record, were proper compliance with section 1678 were matters which should have been submitted to the jury.

 VIII. Taking into consideration the matters stated in the preceding division, and the further fact that Bishop's basement, with its kitchens, pantries, bakeries, lockers, storerooms, office, and private dining room, with the public dining hall on the first floor and the stock room on the fourth floor, was necessarily a busy place used in connection with other floors, and the further fact that if the passenger elevator on the east wall of the building served any part of the basement it must have done so inadequately, with no evidence that it served Bishop's basement at all, it is our conclusion, under the record before us, that the jury should have been permitted to determine whether the use of the elevator for carrying persons, unconnected with freight carriage, required compliance by the defendants with section 1684.1, Code, 1939 (section 104.4, Code, 1946).

In Boles v. Royal Union L. Ins. Co., 219 Iowa 178, 257 N. W. 386, 96 A. L. R. 1400, a freight elevator in the Maytag Hotel at Newton was involved. It was not an elevator constructed, equipped, and operated as was the elevator in the case before us but it was operated by automatic control. It was constructed with circuit breakers, and if any one of the inside doors or the outside door on the alley was open the elevator could not be moved. When all doors were closed the elevator could be operated by push buttons on each floor. The circuit breaker on the outside door was broken at the time of the

injury. It was the contention of the plaintiff-appellee that, while the elevator was constructed as a freight elevator, the evidence showed that it had frequently been used in conveying passengers. The trial court held that it was a question for the jury to determine whether the elevator was a passenger elevator. This court affirmed. See Wilmarth v. Pacific Mut. L. Ins. Co., 168 Cal. 536, 143 P. 780, 782, Ann. Cas. 1915B, 1120, and Losie v. Royal Indemnity Co., 183 App. Div. 744, 171 N. Y. Supp. 174, cited in support of the holding. The controversy arose over the construction to be put on the term "passenger elevator" in the insurance policy.

 This elevator legislation and statutes with like purposes, such as sections 1487, 1495, Code, 1939 (sections 88.6, 88.14, Code, 1946), and other health and safety-appliance enactments were adopted under the police power of the state for the protection of the beneficiaries thereof. These salutary and remedial statutes were adopted to supplement and strengthen the common law, and they receive and should receive a construction as broad and liberal as may be necessary to effect their beneficent purposes. The answer to one injured by a defendant's failure to comply therewith that he knew of the defective equipment and assumed the risk of its use should be scrutinized and passed upon with extreme care and solicitude. It is fitting to repeat the words of Weaver, J., in Poli v. Numa Block Coal Co., 149 Iowa 104, 110, 111, 127 N. W. 1105, 1107, 33 L. R. A., N. S., 646:

"To say that the Legislature in enacting these measures of protection which in some degree equalize the advantages of employer and employee and afford a needed protection to the person and lives of the latter intended that a master might violate the statute to the injury or death of his servant, and then escape liability by pleading and proving that his offense against the law was habitual, obstinate, and notorious, is inconsistent with justice and, it is hardly extravagant to say, repugnant to good morals. Such a rule offers a premium to contemptuous disregard of the statute, and robs it substantially of all value to the class in whose interest it was enacted."

The case before us is not one of employee and employer but it is of a kindred type.

IX. Under the record it was for the jury, and not the court, to determine whether either defendant had violated the provisions of said sections 1678 and 1684.1 (sections 104.1, 104.4, Code, 1946). These statutes are for the benefit of all persons injured from their nonobservance. Hansen v. Kemmish, 201 Iowa 1008, 208 N. W. 277, 45 A. L. R. 498. A violation of them by either defendant would be negligence as a matter of law. Girl v. United States Railroad Admn., 194 Iowa 1382, 1385, 189 N. W. 834; Smith v. Chicago, B. & Q. R. Co., 227 Iowa 1404, 291 N. W. 417, 421, 422; Meier v. Chicago, R. I. & P. R. Co., 224 Iowa 295, 275 N. W. 139. A disregard of the command of the statute is a wrongful act and an implied right of action accrues to one within its protection who is injured by the breach. Texas & Pacific Ry. Co. v. Rigsby, 241 U. S. 33, 36 S. Ct. 482, 60 L. Ed. 874, 877.

X. Defendants argue that if the gate was open at the time plaintiff fell, by reason of the act or omission of Andrews or of some other person, such intervention would relieve each of them from liability, since neither had any knowledge thereof, and time was lacking to correct it. This answer is not acceptable. Plaintiff alleged that each defendant was negligent in failing to comply with statutory commands, thereby creating a dangerous condition of long standing. It was negligence which was continuous throughout the period from the original breach to the very time of the injury. It is not contended that either defendant had no knowledge of this condition. Under the record a jury would have been justified in finding that the condition of the elevator and the manner of its operation had been substantially the same for several years. Actual knowledge or notice of the intervening event would not be essential to the original wrongdoer's liability. The continuing dangerous condition rendered any such intervention reasonably foreseeable, and gave ample time to remedy the condition and remove the cause. If the negligence of either defendant was a proximate cause of plaintiff's injury, the fact that some other cause operated with that negligence to cause

the injury, such concurring or co-operating cause would not exculpate the defendants or relieve them from liability. Steburg v. Vincent Clay Prod. Co., 173 Iowa 248, 155 N. W. 337; Miller v. Cedar Rapids Sash & Door Co., 153 Iowa 735, 744, 134 N. W. 411; Johnson v. McVicker, 216 Iowa 654, 657, 247 N. W. 488; Gould v. Schermer, 110 Iowa 582, 70 N. W. 697; Aga v. Harbach, 140 Iowa 606, 117 N. W. 669; Harvey v. City of Clarinda, 111 Iowa 528, 82 N. W. 994; Pratt v. Chicago, R. I. & P. Ry. Co., 107 Iowa 287, 77 N. W. 1064; McCreery v. Union Roofing & Mfg. Co., 143 Iowa 303, 308, 119 N. W. 738, 740 (involving a safety-appliance statute). See, also, Donnelly v. Fort Dodge Portland Cem. Corp., 168 Iowa 393, 401, 148 N. W. 982; Klaffke v. Bettendorf Axle Co., 125 Iowa 223, 100 N. W. 1116; Roth v. Buettell Co., 142 Iowa 212–215, 119 N. W. 166; Tvedt v. Wheeler, 70 Minn. 161, 72 N. W. 1062; Morse v. Houghton, 158 Iowa 279, 286, 136 N. W. 675, 678.

"The act of a third person, intervening and contributing a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been foreseen." Lane v. Atlantic Works, 111 Mass. 136, 139.

See, also, Colorado Mtg. & Inv. Co. v. Giacomini, 55 Colo. 540, 136 P. 1039, 1048, 1049, L. R. A. 1915B, 364; 13 Cyc. 25, note 54; 21 Am. & Eng. Ency. of Law, Second Ed., 491; 16 R. C. L., Landlord and Tenant, section 589.

In Tralle v. Hartman Furniture & Carpet Co., 116 Neb. 418, 420, 425, 217 N. W. 952, 953, 955, action was against the lessor and lessee for failure to comply with an ordinance requiring " 'All freight elevator platforms * * * shall be equipped with a wire-mesh guard over top of same.' " The intestate operating the elevator was killed when he was struck on the head by a hammer accidentally dropped by an electrician working on an upper floor. Answering the contention that the latter mishap was the intervening and proximate cause of the death, the court said:

"The failure to comply with the ordinance was existing negligence that continued to the very instant when the hammer

fell. It was not, therefore, a remote cause. * * * In this view of the situation, the active cause attributable to the owners and the electrician's dropping of the hammer were simultaneous operations of negligence. The former was the failure to perform the mandatory and continuing duty imposed by ordinance and the latter was a mere accident in the handling of a common tool. The required guard would have prevented the casualty.''

It has been held that if one in control of a passenger elevator was negligent in not providing it with a properly constructed or properly maintained door, and because thereof the injured person entered the open door and fell to the bottom of the shaft, it would be no defense even if some *trespasser*, because of the defective door, opened and left open the door. Colorado Mtg. & Inv. Co. v. Rees, 21 Colo. 435, 42 P. 42.

XI. The issue of freedom from contributory negligence was a question of fact for the jury as to both defendants. It is usually so. Indeed, this court has uniformly and repeatedly held that it is the rare and exceptional case when that issue is a question of law. This case falls far short of coming within the rare and exceptional class. It is true that the plaintiff, by his work on the premises for three years, had knowledge of the construction of the elevator, shaft, and other equipment, of the way in which the openings to the shaft and elevator were guarded, and of the manner in which the elevator and its equipment could be operated, and how they were ordinarily operated. In passing upon the issue of contributory negligence all of these matters must be considered and none of them should be ignored. Defendants vigorously stress that plaintiff knew the construction of the elevator and shaft, the kind and character of the guards, the mechanism of the movements of the elevator and of the gates. He did, of course, and that must be charged against him in reaching a correct answer to this question. He knew that the elevator could be stopped on any floor and the user raise the gate and get off and leave the gate raised, with the intention of returning shortly to again use the elevator, and return to find the elevator had been re-

moved by someone on an upper floor, without his knowledge, with the gate still raised. Defendants bear down upon this fact on the question of contributory negligence. But it is a weapon that shoots out of each end. For the fact that the above-noted occurrence could easily and often take place is indicative of the negligence of the defendants in failing to comply with section 1678, Code, 1939, and failing to install such equipment as would prevent or render such occurrences less likely.

Defendants urge that plaintiff must have known this might happen. Maybe he did. But he also knew the manner and method in which the elevator and the gates were usually operated. For he testified that in the thirty-seven months he had used the elevator, up to the night of his injury, he had never known the gate to be up and open on the first floor when the elevator was not at that floor. The able and resourceful attorneys for defendants do not mention this fact. But it is a factor, and a most important factor, in passing upon the issue of contributory negligence, which this court cannot discard. When plaintiff left the elevator to move his truck he did not know whether Andrews got off at the first floor or took the elevator to another. But in the light of his entire experience in using the elevator the jury could find he was warranted in believing that if Andrews took the elevator to another floor he would lower the gate, and if he left the elevator at the first floor he might leave the gate open, particularly since he knew that plaintiff went out merely to move his truck to the dock and would shortly return and go to the basement. But wherever Andrews might go there was reasonable justification for plaintiff's believing, and placing reliance thereon, that if the gate was up the elevator was there. Such had been the experience of Mrs. Hill. On the issue of contributory negligence it is quite immaterial that others had had a contrary experience of which he had no knowledge. Plaintiff knew also of the sign upon the gate. He had always obeyed it. Andrews testified that he also always closed the gate when taking the elevator from a floor. Certainly, plaintiff might reasonably believe that all users of the elevator, and others about the place, would very

likely take note of the warning and comply with the command, as he had always done. He, of course, could not rely upon it absolutely. He was required to use his eyes. And he did. As he came into the entry he looked and saw the gate was open. In keeping with his experience it was in his mind that the elevator was there, but in passing Mrs. Hill going to the elevator he looked again and thought he saw the elevator there. Maybe his optical view was influenced by the reliance which was in his mind because of his past experiences. But we are lighted to most of our conclusions, right or wrong, by the lamp of our knowledge and past observations and experiences.

The north half of the shaft opening was closed. He walked diagonally southwest, so that he did not have a full, front view of the opening. The floors of the elevator and of the entry were dark and dirty and of much the same appearance. Nobody testified that the place was well lighted. His attention was diverted momentarily to Mrs. Hill. It was a diversion of his own volition, but it is a matter for consideration on this issue. We have often so held. In Van Camp v. City of Keokuk, 130 Iowa 716, 720, 107 N. W. 933, the diversion was a barefoot boy, which the court considered in affirming a judgment for plaintiff. In a number of cases diverting circumstances of similar character voluntarily given attention by plaintiffs have been accorded weight in finding that the question of contributory negligence was for the jury to answer. In Overton v. City of Waterloo, 164 Iowa 332, 336, 145 N. W. 889, and in Mathews v. City of Cedar Rapids, 80 Iowa 459, 463, 45 N. W. 894, 20 Am. St. Rep. 436, an attractive show window was the diverting circumstance in each case. In Greenlee v. City of Belle Plaine, 204 Iowa 1055, 1058, 216 N. W. 774, it was a conversation with a companion. In Wheeler v. Sioux Paving Brick Co., 162 Iowa 414, 431, 142 N. W. 400, 406, the momentary distraction was a glance to verify his thought that a car was approaching. There was none, but in giving the matter consideration, the court said:

"The authorities generally are to the effect that one whose attention is diverted is not to be held to the same closeness

of observation as he would otherwise be; and where his act, but for such diverted attention, would have been negligent, upon proof tending to show conditions throwing him off his guard, the question of his negligence is one for the jury. Taylor v. Wabash Ry. Co., 112 Iowa, [157], 160 [83 N. W. 892], and cases cited; Lorenz v. B., C. & N. Ry. Co., 115 Iowa, 377 [88 N. W. 835, 56 L. R. A. 752]; Marnan v. C., R. I. & P. Ry. Co., 156 Iowa, 457 [136 N. W. 884]. * * * There is a clear distinction between forgetfulness which, unless there are circumstances that excuse it, is one phase of negligence, and a sudden arising of conditions which throw one off his guard, and for the moment without fault on his part divert his attention from a danger not forgotten, but guarded against.''

In the case before us plaintiff did not give his undivided thought and attention to the elevator entrance. He did look as soon as he opened the north door, and said he saw the door was open, and, relying on his past experience, thought that the open door indicated the elevator must be there. He looked again as he approached the open door and thought the elevator was there. It was not a case of inattention, nor of forgetfulness, nor of heedlessness, nor of inadvertently and unexpectedly taking a step which he did not intend to take, as happened in Trainor v. H. A. Maine & Co., 184 Iowa 549, 168 N. W. 872, where the plaintiff by some inadvertence stepped ''sideways and backwards'' into the elevator well. Plaintiff stepped where he intended to step but through a misapprehension and a misconception of facts induced by a number of conditions and circumstances worthy of such reliance that a court should not find him conclusively negligent.

Another fact which courts have uniformly construed favorably to plaintiff on the issue of contributory negligence in cases of this kind is that the door of the elevator was open. It has been considered as an important factor in the affirmance of judgments for plaintiff and of requiring the submission of plaintiff's negligence to the jury. A closed or partly closed elevator door is construed as a warning or a notice to investigate. But an open elevator door is uniformly regarded as an

invitation to enter. It has been held that it is not negligence per se to fail to look before entering an elevator where the door is open. See Perrault v. Emporium Dept. Store Co., 71 Wash. 523, 128 P. 1049, 1050; Wheeler v. Hotel Stevens Co., 71 Wash. 142, 127 P. 840, Ann. Cas. 1914C, 576; Tousey v. Roberts, 114 N. Y. 312, 21 N. E. 399, 11 Am. St. Rep. 655; Colorado Mortgage & Inv. Co. v. Rees, supra, 21 Colo. 435, 42 P. 42; Peoples Bank v. Morgolofski, 75 Md. 432, 23 A. 1027, 32 Am. St. Rep. 403; Southern Bldg. & L. Assn. v. Lawson, 97 Tenn. 367, 37 S. W. 86, 56 Am. St. Rep. 804; Fisher v. Cook, 23 Ill. App. 621; Dawson v. Sloan, 17 Jones & S. [49 N. Y. Super. Ct.] 304, affirmed in 100 N. Y. 620; Grand Rapids Bedding Co. v. Grand Rapids Furniture Temple Co., 218 Mich. 486, 188 N. W. 538; Morgan v. Saks, 143 Ala. 139, 38 So. 848; Stephens v. Chausse, XV Can. Sup. Ct. 379; Oberndorfer v. Pabst, 100 Wis. 505, 76 N. W. 338. See, also, Downing v. Merchants Nat. Bk., 192 Iowa 1250, 184 N. W. 722, 20 A. L. R. 1138, and cases discussed therein, and Hopkinson v. Knapp & Spalding Co., 92 Iowa 328, 60 N. W. 653; Riggs v. Pan-American Wall Paper & Paint Co., 225 Iowa 1051, 283 N. W. 250; Graham v. Ochsner, 193 Iowa 1196, 188 N. W. 838; Roth v. Buettell Bros. Co., supra, 142 Iowa 212–215, 119 N. W. 166.

In Tippecanoe Loan & Tr. Co. v. Jester, 180 Ind. 357, 101 N. E. 915, L. R. A. 1915E, 721, the plaintiff fell through an opening in an elevator shaft. She alleged in her petition *that it had been the custom of the owners and operators to have the door of the elevator open when the elevator was in position at such door, of which custom she was aware, and on the day of the accident, she saw the elevator door open, and not knowing the elevator was not in position opposite the door she stepped through the door to enter the elevator. It was not there and she fell to the bottom of the shaft. Defendant's demurrer that the petition showed she was contributorily negligent as a matter of law was overruled. The Supreme Court of Indiana affirmed.* The fact that the elevator in that case was a passenger elevator does not weaken the applicability of the rule in the case at bar.

The issue of plaintiff's freedom from contributory negligence should have been submitted to the jury. Proximate cause and contributory negligence are questions for the jury save in the very exceptional case when all reasonable minds must unite in a contrary conclusion. This is not such a case.

XII. Each defendant pleaded, "by way of affirmative defense," assumption of risk by the plaintiff, in its true sense; that is, that, conceding their negligence as alleged, the plaintiff had assumed the risk of the same and was precluded from recovery of damages. Martin v. Des Moines Edison L. Co., 131 Iowa 724, 734 et seq., 106 N. W. 359; Duffey v. Consolidated Block Coal Co., 147 Iowa 225, 228, 229, 124 N. W. 609, 30 L. R. A., N. S., 1067; Woodworth v. Iowa Cent. Ry. Co., 170 Iowa 697, 713–716, 149 N. W. 522; McClary v. Great Northern Ry. Co., 209 Iowa 67, 71–73, 227 N. W. 646. Defendants did not consider it as a bar in the nature of contributory negligence, but pleaded it as a defense, and, as the cases above cited and many others hold, had the burden of establishing it by a preponderance of the evidence.

Where the negligence of the plaintiff and his assumption of the risk of defendant's negligence are each an issue, the evidence for or against either is of like force as to the other. The recitation of facts and the reasoning in the division just preceding, dealing with freedom from contributory negligence, apply with equal force to the issue of assumption of risk, and sustain our conclusion that its determination was for the jury and not for the court.

Assumption of risk is ordinarily a question of fact. As said in Mace v. Boedker & Co., 127 Iowa 721, 731, 104 N. W. 475, 478:

"As already suggested, the defense is one upon which the employer must assume the burden; and, in the absence of exceptional circumstances not here appearing, it must go, with the questions of negligence and contributory negligence, to the jury."

In Gordon v. Chicago, R. I. & P. Ry. Co., 146 Iowa 588,

596, 123 N. W. 762, 765, speaking of this defense, the court said:

"* * * the employer has the burden of proof, and it is only in rare instances that, upon a contested question of fact, the court may properly direct a verdict in favor of the party having the burden of proof."

This court has repeatedly held that one cannot be held contributorily negligent, as a matter of law, simply because he had knowledge of the defect or condition which caused his injury and appreciated that there was danger. Proof of knowledge of the condition and of its danger still leaves the issue for the jury. To enable the court to decide the issue as a matter of law, it must be shown that, in addition to the knowledge of the defect and the danger, the evidence must establish that the injured person knew, or as a reasonably prudent and careful person should have known, that it was *imprudent* on his part.

In Lewis v. Cratty, 231 Iowa 1355, 1363, 4 N. W. 2d 259, 263, where the court unanimously held plaintiff negligent as a matter of law, we said: "He knew the revolving shaft was dangerous *and should be avoided.*" (Italics supplied.) Our latest decision to the same effect, wherein the numerous decisions so holding are collated, is Beach v. City of Des Moines, 238 Iowa 312, 26 N. W. 2d 81.

We have applied the same principle of law in assumption of risk cases many times. In George v. Iowa & S. W. Ry. Co., 183 Iowa 994, 1004, 168 N. W. 322, 325, the court said:

"For it is not knowledge that something exists which might cause injury that takes assumption of risk from a jury; that is for the jury, unless, in addition to knowing that the instrumentality was present, a reasonably prudent man should, as a matter of law, have known and appreciated the danger. The matter is for the court *only when the danger is so obvious and glaring that an ordinarily prudent man would not undertake the work in the face of such danger.*" (Italics supplied.)

Like language was used in Gorman v. Des Moines Brick

Mfg. Co., 99 Iowa 257, 264, 68 N. W. 674; Melody v. Des Moines Union Ry. Co., 161 Iowa 695, 705, 141 N. W. 438; Kerlin v. Chicago & N. W. Ry. Co., 149 Iowa 440, 447, 128 N. W. 548.

Let us apply these rules of law to the facts before us. As we have heretofore stated, plaintiff knew the construction, the guarding, and the mechanical operation of the elevator, and he knew the possibility of danger. But, after working there for thirty-seven months, he had never seen the gate open at the first floor when the elevator was not there. In view of that experience, was there any justification for the court's finding and decision that the plaintiff should have apprehended that the misfortune which befell him was so likely to happen, so threatening and so imminent, that he, as a reasonably prudent person, should have quit his work? Would all reasonable persons unite in saying so? We cannot so hold.

In Steburg v. Vincent Clay Prod. Co., supra, 173 Iowa 248, 260, 155 N. W. 337, 341, the issues of contributory negligence and assumption of risk were involved. We said:

"The court cannot assume to say that the danger was of that extreme and self-evident character which no man of ordinary prudence would risk."

XIII. There is no merit in the defendants' contention that plaintiff, as an independent contractor, made his own place to work and for that reason assumed the risk of its being unsafe. The argument is without force for two reasons. First, plaintiff was not an independent contractor. Second, if he were an independent contractor, he did not make, or in any way change, the place where he worked. He performed his work in the place, and with the instrumentalities, which the defendants furnished him. The decisions from other jurisdictions and Branstrator v. Keokuk & W. Ry. Co., 108 Iowa 377, 79 N. W. 130, and Reilly v. Chicago & N. W. Ry. Co., 122 Iowa 525, 98 N. W. 464, have no application.

It is our conclusion that, under the record presented, the issues of freedom from contributory negligence, negligence of the defendants, and assumption of risk of the negligence of the defendants, should have been submitted to the jury, and

that the court erred in directing verdicts for each of the defendants, and rendering judgments thereon in their favor and against the plaintiff.

The judgments are therefore—Reversed.

GARFIELD, OLIVER, MULRONEY, and HAYS, JJ., concur.

WENNERSTRUM, C. J., and SMITH, HALE, and MANTZ, JJ., dissent.